623 P.2d 464

**YACHT CLUB SALES AND SERVICE, INC., an Idaho Corporation, Plaintiff-Respondent and Cross-Appellant,**

v.

**The FIRST NATIONAL BANK OF NORTH IDAHO, an Idaho Corporation, Defendant-Appellant and Cross-Respondent.**

**No. 12759.**

Supreme Court of Idaho.

Dec. 24, 1980.

Scott W. Reed, Coeur d'Alene, Erick K. Nayes and Thomas D. Cochran of Witherspoon, Kelley, Davenport & Toole, Spokane, Wash., for defendant-appellant and cross-respondent.

Michael J. Verbillis, and W. W. Nixon of Nixon, Nixon, Lyons & Bell, Coeur d'Alene, for plaintiff-respondent and cross-appellant.

McFADDEN, Justice.

## ON REHEARING

Plaintiff-respondent Yacht Club Sales and Service Inc., an Idaho corporation engaged in the sales and service of boats, motors and accessories at Coeur d'Alene, instituted this action against defendant-appellant, The First National Bank of North Idaho. Respondent sought compensatory and punitive damages against appellant for appellant's dishonor of two series of checks written by respondent, payable to and presented by various parties to appellant Bank. Following a jury trial on the issues presented by the pleadings of the parties and the pretrial order of the court, the jury returned a special verdict wherein the jury answered certain interrogatories. The checks involved in this action break down into two separate classifications, the first being exhibits 6A, 7, 8, 9, 10, 11, 12 and 13, which were stipulated to have been dishonored by appellant Bank. At the close of all the evidence, the trial court ruled that this first series of checks had been *wrongfully*

dishonored as a matter of law. The second classification is a series of checks, exhibits 14B, 14C, 17, 18, 19, 20, 21, 22, 24, 26 and 30, which the jury by its answer to an interrogatory in the special verdict, held had not been dishonored without lawful excuse or reason.

In its special verdict, the jury held that respondent was entitled to $20,000 as compensatory damages for appellant's dishonor of the first series of checks (exhibits 6A, 7, 8, 9, 10, 11, 12 and 13), and also that respondent was entitled to punitive damages in the amount of $30,000. Judgment was entered in favor of respondent for $50,000 on this verdict. Appellant timely filed its motions for new trial and for judgment notwithstanding the verdict, which motions were denied, and this appeal was taken by appellant from the judgment and from the order denying its motion for new trial. Respondent cross-appealed from the ruling of the trial court denying its motion for attorney fees in the amount of $9,500 under I.C. § 12–121, and also seeks attorney fees on this appeal.

The principal issue presented by this appeal is whether the trial court improperly instructed the jury in various regards. It is the conclusion of the court that there was error present in the instructions given and for that reason this case must be reversed and remanded for further proceedings.

Respondent Yacht Club Sales and Service, Inc. (herein Y.C.S.S., Inc.), operated its business on land owned by "Yacht Club, Inc." a different corporation, although similarly named. Charles Harris, the principal stockholder and president-manager of Y.C. S.S., Inc. testified that he had operated Y.C.S.S., Inc. since November 1974, and prior to that time had operated the business as a sole proprietorship. Y.C.S.S., Inc. maintained a checking account with the Coeur d'Alene branch of appellant Bank. On Wednesday, June 18, 1975, at a time when there was $11,930.72 on deposit in the Y.C. S.S., Inc. account with appellant Bank, the Bank was served by the sheriff's office of Kootenai County with a sheriff's notice and a writ of execution[1] upon which Yacht Club, Inc. was named as the judgment debtor on behalf of James W. Givens, trustee for J. E. Hall Contractors, Inc., the judgment creditor. An interrogatory served with the writ inquired:

"At the time of the service of the Notice upon you, had you in your possession or under your control any property, money

---

1. "IN THE DISTRICT COURT OF THE FIRST JUDICIAL DISTRICT OF THE STATE OF IDAHO, IN AND FOR THE COUNTY OF KOOTENAI

"JAMES W. GIVENS, Trustee for
and on behalf of J. E. Hall Contractors, INC., a Bankrupt Plaintiff,
vs.
YACHT CLUB, INC., an Idaho corporation, Defendant.

CASE NO. 3 0 4 9 3
WRIT OF EXECUTION

"THE PEOPLE OF THE STATE OF IDAHO TO THE SHERIFF OF KOOTENAI COUNTY, STATE OF IDAHO, GREETINGS:

"WHEREAS, on the 3rd day of September, 1974, the Plaintiff in the above entitled action recovered Judgment in the above entitled Court against the above named Defendant in the sum of $59,551.88, together with interest thereon at the rate of eight percent (8%) until paid;

"WHEREAS, the sum of $59,551.88, including interest and costs in the sum of $30.20, together with interest at the rate of eight percent (8%) running from September 3, 1974, until paid, is now due Plaintiff from Defendant on said Judgment.

"NOW, YOU, THE SHERIFF OF THE COUNTY OF KOOTENAI, STATE OF IDAHO, are hereby required to do the following:
"I
"To make the $62,680.35 including interest at the rate of eight percent (8%) per annum, running from September 3, 1974, until paid, to satisfy the Judgment out of the personal property of the Defendant, Yacht Club, Inc., OR
"II
"If sufficient personal property of the Defendant cannot be found to satisfy the Judgment, then to make the same out of the real property belonging to the Defendant in the County of Kootenai, State of Idaho, on September 3, 1974, the date of Judgment, or at any time thereafter.
"TO MAKE RETURN ON THIS WRIT WITHIN TEN (10) DAYS AFTER YOU RECEIVE IT, WITH ENDORSEMENT THEREON OF WHAT YOU HAVE DONE.
"DATED this 25th day April, 1975.
"WITNESS MY HAND and the seal of said Court the day, month, and year next above written.
"MS CAROL DIETZ, CLERK
"By Janet McDaniels
Deputy"

or effects of the within named Defendant (or either of them)? If so, state which property, what money or effects, how much and what value.

Mr. Cyril Thornycroft, vice-president and manager of the Coeur d'Alene office, answered as follows:

"We are holding funds in the name of Yacht Club Sales & Service, Inc. in the amount of $11,930.72, pending clarification as to whether Yacht Club Sales & Service, Inc. and Yacht Club, Inc. are one and the same."

At trial, Mr. Thornycroft testified that upon receipt of the writ he contacted his superior, Mr. Lane, the cashier in the head office of the bank at Wallace, and was advised by Lane to respond to the interrogatory in the manner Thornycroft did. Mr. Lane testified that it was his belief that under the existing facts, it was the obligation of the court to resolve the issue presented by the similarity of names of Yacht Club, Inc., the judgment debtor, and Yacht Club Sales and Service, Inc., appellant's customer.

The same day appellant Bank answered the interrogatory and returned it to the sheriff, Wednesday, June 18, the Bank placed a "hold" on respondent's account, but neither Mr. Harris, nor any other employee of respondent Y.C.S.S., Inc., was notified that such action was taken. Respondent continued making deposits into the account in the amount of $39,873.82 between June 23 and June 25, and these funds were also affected by the "hold" without respondent's knowledge.

Eight checks drawn on respondent's account (i. e. the first series of checks, exhibits 6A–13) were presented to appellant Bank between June 19 and June 23. These checks were returned with the notation, "refer to maker." Mr. Harris first learned of appellant Bank's action on Wednesday,

June 25, a week after the "hold" took effect, when an employee of the Farmers and Merchants Bank of Spokane contacted him and informed him that checks drawn on the Y.C.S.S., Inc. account were being returned. Farmers and Merchants Bank had accepted two small checks of Y.C.S.S., Inc., from the payees on the checks (these two checks are included in the first series of checks), but when they were forwarded for collection the checks were returned unpaid.

When Mr. Harris learned that Y.C.S.S., Inc., checks were being returned unpaid, he immediately sent his attorney to see Mr. Thornycroft at appellant's Coeur d'Alene office. Following the attorney's visit, Mr. Thornycroft, for the first time since service of the writ and placing the "hold" on the account, contacted the sheriff's office and the bank's attorney. Mr. Thornycroft testified that the bank did nothing sooner because it was his belief the writ required the bank to hold respondent's funds until the court determined whether the judgment debtor named in the writ, Yacht Club, Inc., and respondent Y.C.S.S., Inc. were one and the same.

The bank removed the "hold" from respondent's account on the afternoon of June 26, after their attorney advised them to release the "hold" because Yacht Club, Inc., and Y.C.S.S., Inc. were two separate entities. However, due to a computer error, respondent's funds were not released until June 27.[2] Eleven checks drawn on respondent's account which were presented to the Bank on or after June 24 (i. e. the second series of checks), were then paid on June 27. Seven of the eight checks in the first series of checks (exhibits 7, 8, 9, 10, 11, 12, and 13) were also paid on June 27. (Apparently a new check for exhibit 6A was issued and later paid.)

On appeal, the Bank contends that the trial court erred in several regards in its

---

2. Appellant bank used the services of a leased computer in Spokane, Washington, to process checks and deposits in individual accounts. Such items were handled from Wallace by courier to Spokane. When a "hold" was placed on the account, the computer was instructed not to pay any checks presented, but to return them. When the "hold" was released, it was a direction to the computer to process and pay all checks presented up to the credit reflected in the account.

instructions to the jury. First, appellant contends that instruction no. 14, regarding a bank's duty when served with a writ of execution, is erroneous. Instruction no. 14 states:

"YOU ARE INSTRUCTED that when a Writ of Execution is served upon a bank, the bank must

(1) either deliver and surrender the funds in the name of the judgment-debtor that are on that day in the possession of the bank, minus any amount of money that the bank claims is owed to it from that judgment-debtor, or,

(2) answer that it has no funds in the name of the named judgment-debtor, or

(3) answer that it does not know. In the said third event if the officer serving the Writ of Execution does not demand the funds, the bank should continue to handle its depositor's demand account in the usual and ordinary course of business."

Appellant contends that paragraph (3) of the above instruction is an incorrect statement of the law because it requires a bank to handle its customer's account in the usual and ordinary course of business when it does not know whether its customer is the judgment-debtor named in the writ. It is appellant's position that once it gave a qualified answer to the interrogatory, it was entitled to treat its customer's account as impounded until there was a judicial determination as to whether such account belonged to the judgment-debtor. Otherwise, appellant claims, it would be exposed to inconsistent liabilities because it would have to ignore either the writ of execution, at the risk of being held liable to the judgment-creditor, or the demands of its customer, at the risk of being held liable for wrongful dishonor. We disagree.

■ A bank that is served with a writ of execution cannot be held liable to a judgment-creditor unless it handles funds in the name of the judgment-debtor (i. e. *the defendant named in the writ of execution*) in disregard of the writ. *German Nat. Bank v. National State Bank*, 5 Colo.App. 427, 39 P. 71 (1895); *Pascagoula Nat. Bank v.*

*Eberlein*, 161 Miss. 337, 131 So. 812 (1931); *O'Neil v. New England Trust Co.*, 28 R.I. 311, 67 A. 63 (1907). The one exception to this rule is in cases where there is proof that the bank had actual knowledge that the debtor named in the writ and its customer are one and the same. *German Nat. Bank v. National State Bank, supra*. Thus, the duty of a garnishee bank is to find out whether the defendant named in the writ of execution has funds on deposit with it, and it need not examine the affairs of any person other than the one named in the writ. *O'Neil v. New England Trust Co., supra*. In *German Nat. Bank v. National State Bank, supra*, the judgment-creditor of W. G. Motley incorrectly identified him as W. J. Motley, resulting in a writ of attachment that ran against W. J. Motley. The garnishee bank was served with process of garnishment, with notice to answer indebtedness to W. J. Motley. Although at the time of the service of notice, the bank had funds of W. G. Motley in its possession, the court held that the answer of the garnishee that the bank was not indebted to W. J. Motley was legally and technically correct. Ruling that a writ of attachment and notice of garnishment against "W. J. Motley" would not reach moneys due "W. G. Motley," the court explained the rationale of such a rule as follows:

"In the intricate and complicated business of banking, absolute exactness and particularly in regard to names is absolutely indispensable, not only for the security of the bank, but of those doing business with it. In many instances there are many of the same surnames, and frequently with the same first initial letter; and, where the full name is not used, it frequently occurs that the second or intermediate initial is all that distinguishes one name from another; and a bank disregarding the middle initial as a part of the name would be very likely to find itself in trouble by allowing one man to draw upon the account of another. If such trouble occurred, no bank could shield itself from responsibility by ignoring the only distinctive difference between the names of two persons. When

banks are necessarily held to such strict accountability, it is not asking too much that in proceedings against them the individual sought to be reached should be so designated as to leave no doubt in regard to the identity. Banks cannot presume that John A. Smith and John W. Smith are the same person. Creditors are supposed to know the names of their debtors, especially when, as in this case, the indebtedness is evidenced by a promissory note, and in bringing suit should be held to bring the suit against the proper person, or suffer the penalty of their own negligence. . . . . [A] garnishee is totally unaffected by any notice which may be served upon him, unless it properly runs with an accurate description against the individual to whom he may be indebted, unless it be in those cases where the proof may show that the garnishee had actual knowledge of the identity of the debtor and the person named in the process." 39 P. at 72.

The interrogatory in question was couched in the terms of the statute,[3] and states:

"At the time of the service of this Notice upon you, had you in your possession or under your control any property, money or effects of the within named Defendant (or either of them)? If so, state what property, what money or effects, how much and what value."

As discussed in *German Nat. Bank v. National State Bank, supra,* banks are held to a strict accountability as to their depositor's funds. By the same token creditors are under a like obligation to be certain of the names of their debtors, and if the bank is going to honor any garnishment notice, it must ascertain that the judgment debtor is one and the same as its depositor.

The interrogatory here asked whether the appellant bank had any property belonging to the defendant named in the writ of execution. The defendant (judgment debtor) named in the writ was Yacht Club, Inc. Thus, under the existing facts and the law just stated, the appellant bank could have answered that it had no funds in the name of the named judgment debtor. This course of action was set forth in paragraph (2) of Instruction no. 14. The onus would thereafter be upon the judgment creditor to take further action; without such action there is nothing upon which garnishment liability of the bank could be premised. *Twin Falls Realty Co. v. Brune,* 45 Idaho 579, 582–3, 264 P. 382 (1928); *Eagleson v. Rubin,* 16 Idaho 92, 100 P. 765 (1909). I.C. § 8–515.

In the alternative, the bank could have answered in a qualified manner, as provided for in paragraph (3) of Instruction no. 14, stating that it did not have funds in the name of that judgment debtor but had funds in a name similar to that set forth in the writ. However, so answering would not give rise to an ability or right on the part of the bank to "hold" the funds of its similarly-named customer pending possible resolution of any confusion as to the identity of the judgment debtor. Again, it is up to the judgment creditor to take action in this regard, and until he does so and the court orders to the contrary, the bank is not liable under the writ for continuing to handle the ungarnished customer's account in the ordinary course of business. *Twin Falls Realty Co. v. Brune, supra.*

In the present fact situation, for example, the judgment creditor could have taken ex-

3. Section 8–511:

"Interrogatories submitted to garnishee.— Written interrogatories which may be in the following form may be delivered to the garnishee at the time of serving notice of garnishment:

1. At the time of the service of the garnishment, had you in your possession, or under your control, any property, money or effects of the defendant? If so, state what property, how much, and of what value, and what money or effects?

2. At the time of garnishment, did you owe the defendant any money, or do you owe him any now? If so, state how much, on what account, and when did it become due? If not due, when will it become due?

To these may be added any other proper and pertinent questions the answers to which might tend to show a liability on the part of the garnishee to the defendant."

ception to the sufficiency of the answer or could have denied the answer. I.C. §§ 8–513, 514. (We are here merely noting alternatives, not suggesting the merit, if any, in such action.) The issues thus raised by the creditor as to the relationship between Yacht Club, Inc. and Y.C.S.S. would then be tried and in due course a judgment would be rendered regarding the liability of the bank as garnishee. I.C. § 8–514; *Eagleson, supra* 16 Idaho at 97–100, 100 P. at 766–8. If the court decided that the Y.C.S.S., Inc. account indeed constituted a garnishable debt of the judgment debtor, only then would the bank be justified in placing a hold on the account of its customer.[4]

But absent any affirmative action on the part of the judgment creditor and court, the bank is not entitled to treat the account as impounded. The writ sought no relief against Y.C.S.S., Inc. and the bank is powerless to extend, *sua sponte*, the reach of the writ.

As we have noted, any "risk" to the bank in this situation can be avoided by its answering in the manner provided for in Instruction no. 14, continuing to treat the account in the normal manner, and leaving the next step, if any, to the judgment creditor and court. While the instruction is not fully correct, it is the conclusion of the court that there was no error in the giving of Instruction no. 14.

■ Next appellant bank contends that the trial court erred in instructing the jury on its liability to respondent. I.C. § 28–4–402 governs a bank's liability to its customer for the wrongful dishonor of a check. It states:

"Bank's liability to customer for wrongful dishonor.—A payor bank is liable to its customer for damages proximately caused by the wrongful dishonor of an

item. When the dishonor occurs through mistake liability is limited to actual damages proved. If so proximately caused and proved damages may include damages for an arrest or prosecution of the customer or other consequential damages. Whether any consequential damages are proximately caused by the wrongful dishonor is a question of fact to be determined in each case."

First, appellant claims that the trial court erred in refusing to give the following proposed instruction:

"You are instructed that when a bank dishonors a check by mistake, the bank's liability is limited to actual damages proved."

Although in light of the second sentence of I.C. § 28–4–402 the above instruction is a correct statement of the law, we find no error in the trial court's refusal to instruct the jury on dishonor by mistake.

■ "Mistaken dishonor" means a wrongful dishonor done erroneously or unintentionally. *Allison v. First Nat. Bank,* 85 N.M. 283, 511 P.2d 769 (1973) rev'd on other grounds, 85 N.M. 511, 514 P.2d 30 (1973). Dishonors resulting from inadvertent bookkeeping errors and other unintentional employee errors would be mistaken dishonors. Cf. *Schaffner v. Ehrman,* 139 Ill. 109, 28 N.E. 917 (1891) (bookkeeping mistake); *Crites & Crites v. Security State Bank,* 52 Mont. 121, 155 P. 970 (1916) (credit of deposit to wrong account); *Nealis v. Industrial Bank of Commerce,* 200 Misc. 406, 107 N.Y.S.2d 264 (1951) (credit of deposit to wrong account). On the other hand, where a dishonor is caused by a setoff or charge made by a bank under an erroneous belief that it had a legal right to do so, the wrongful dishonor resulting from the improper setoff or charge is not classi-

4. It would appear that upon proper motion of the judgment creditor the court could issue a temporary restraining order prohibiting the bank from continuing to handle the account in the ordinary course of business pending the resolution of the identity issue, i. e., keep the account from being tapped in the meantime. *Lindenthal v. Burke,* 2 Idaho 571, 573, 21 P. 419 (1889). Such a provision is present in the "at-

tachment" section of Title 8, Idaho Code, though no similar statutory language is present in the "garnishment" sections. See I.C. § 8–502(d). Upon this affirmative action of the court, the bank would be entitled to place a hold on the account; certainly any continuing normal treatment of the account after such an order would be at the bank's peril.

fied as mistaken. *Meinhart v. Farmers' State Bank*, 124 Kan. 333, 259 P. 698 (1927); *Wildenberger v. Ridgewood Nat. Bank*, 230 N.Y. 425, 130 N.E. 600 (1921). In accord with the above-cited cases is White and Summers' treatise on the Uniform Commercial Code, wherein the authors state:

"We would ... find the bank guilty of willful dishonor ... any time it dishonored its Customer's checks because it had previously reduced his account through its own improper setoff, improper garnishment or the like. Moreover we would find such reduction 'improper' even though the bank acted in a good faith but mistaken belief that the garnishment or setoff was valid. Although such dishonors might be the result of a 'mistake' in the sense that the bank official was mistaken about his legal rights, we would classify them as willful for they represent the bank's deliberate judgment to sacrifice the customer's interest to those of some other party." White & Summers, Uniform Commercial Code, § 17–4 at 673 (2d ed. 1980).

Ordinarily, whether a dishonor is willful or intentional is a question of fact for the jury. *Loucks v. Albuquerque Nat. Bank*, 76 N.M. 735, 418 P.2d 191 (1966); *Woody v. Nat. Bank of Rocky Mount*, 194 N.C. 549, 140 S.E. 150 (1927). However, when the evidence on an issue of fact is undisputed, and the inferences to be drawn therefrom are plain and not open to doubt by reasonable men, the issue is no longer one of fact to be submitted to the jury, but becomes a question of law. *Loucks v. Albuquerque Nat. Bank, supra.* In the instant case it is uncontroverted that appellant Bank intentionally dishonored eight of respondent's checks, although it did so with the belief that it was legally entitled to do so. Under the authorities cited above, the Bank's action cannot be classified as simply a mistaken dishonor. We therefore hold that the trial court was correct when it implicitly ruled that as a matter of law the eight checks had not been dishonored by mistake and we find no error in its refusal to instruct the jury as to the mistake language of the wrongful dishonor sections, I.C. § 28–4–402.

Appellant also contends that the trial court erred in instructing the jury on the definition of "negligence." Appellant argues, and this court agrees, that the concept of negligence is inapplicable to the instant case because a bank's liability for the wrongful dishonor of a check is exclusively governed by I.C. § 28–4–402. *Cf. Allison v. First Nat. Bank, supra; First Nat. Bank of Bellaire v. Hubbs*, 566 S.W.2d 375 (Tex.Civ. App.1978). Comment 4 to I.C. § 28–4–402 provides:

"Wrongful dishonor is different from 'failure to exercise ordinary care in handling an item,' and the measure of damages is that stated in this section, not that stated in Section 4–103(5)."

However, it is our opinion that instructing the jury on the definition of negligence was harmless error in the instant case since the jury's award of damages for respondent was based solely on the first series of checks which the trial court held had been wrongfully dishonored as a matter of law. Finding no prejudicial error, this court will not reverse the trial court's judgment on this ground. *Obray v. Mitchell*, 98 Idaho 533, 567 P.2d 1284 (1977); *Annau v. Schutte*, 96 Idaho 704, 535 P.2d 1095 (1975).

Appellant's argument in regard to the trial court's application of I.C. § 28–4–402 to the instant case concerns the instruction given to the jury on the burden of proving injury. Instruction no. 23 states:

"In this case the plaintiff has also alleged damages for loss of its credit and business standing as a result of the bank's conduct in refusing to pay checks that were drawn on the plaintiff's bank account during the period of time in question.

"You are instructed that *if you find that the Defendant bank dishonored checks drawn on the Plaintiff's checking account then the Plaintiff is not required to prove any particular amount of damage for harm to its credit and business standing, but that the Defendant has the burden of proving that the Plaintiff has*

not had its business and credit standing damaged." (Emphasis added.)

This instruction sets forth the common law rule, under which a "merchant or trader" was allowed to recover substantial damages for wrongful dishonor without proof of actual injury. *Schaffner v. Ehrman, supra* 28 N.E. 917; *Crites & Crites v. Security State Bank, supra*, 155 P. 970; Holland, *An Analysis of the Legal Problems Resulting from Wrongful Dishonors*, 42 Mo.L.Rev. 507 (1977). The rule was usually based on the theory that dishonor of a "merchant or trader's" check involved an imputation of insolvency, dishonesty, or bad faith and thus defamed him in his trade or business. *Schaffner v. Ehrman, supra.* This rule, which became known as the "trader rule," was also supported on the ground that a dishonor necessarily resulted in an impairment of the credit of a merchant or trader and that the impairment of credit constituted a substantial injury for which the trader was entitled to recover more than nominal damages. *Browning v. Bank of Vernal*, 60 Utah 197, 207 P. 462 (1922). This court's opinion in *First Piedmont Bank and Trust Co. v. Doyle*, 97 Idaho 700, 551 P.2d 1336 (1976), contains dicta to the effect that the "trader rule" applied in actions brought under I.C. § 28–4–402 and the court below relied on *Piedmont* in instructing the jury that the burden of proof of lack of damage or loss is on the bank when it dishonors a customer's check.

Contrary to the *Piedmont* statement however, this state had in effect prior to the adoption of the U.C.C. a statute which provided

"Liability for nonpayment of checks.—No bank shall be liable to a depositor because of the nonpayment through mistake or error and without malice of a check which should have been paid unless the depositor shall allege and prove actual damage by reason of such nonpayment, and in such event, the liability shall not exceed the amount of damages so proved." Former I.C. § 26–1013.

This particular provision was enacted in 1925. Credit for its drafting has been given the American Banking Association, and the perceived design of the statute was to negate the "trader rule" on dishonored checks. Daniels, *Bank Liability for Wrongful Dishonor: UCC Section 4–402—Is Revision Necessary?* 8 Ind.L.R. 802, 810–811 (1975); 10 Am.Jur.2d, Banks, §§ 574–5, pp. 544–5. *Accord Abramowitz v. Bank of America*, 131 Cal.App.2d Supp. 892, 281 P.2d 380, 382 (1955). The adoption in Idaho of I.C. § 28–4–402 thus was not a radical departure from pre-existing law. Although, as stated in *Skov v. Chase Manhattan Bank*, 407 F.2d 1318, 1319 (3d Cir. 1969), § 4–402 of the Uniform Commercial Code (I.C. § 28–4–402) "is not a model of clarity in its reference to 'damages proximately caused', 'actual damages proved', and 'consequential damages,'" it, like the former Idaho statute, appears clear in intent.

Respondents have cited the case of *American Fletcher Nat'l Bank & Trust Co. v. Flick*, 146 Ind.App. 122, 252 N.E.2d 839 (1969), for the proposition that Comment 3 to U.C.C. 4–402[5] did not actually abolish the so-called "trader rule." However, the decisive issue in the view of that court was one of causation, not burden of proof, and that court did not consider whether U.C.C. 4–402 abolished the rule. Similar reliance is placed on White and Summers, Uniform Commercial Code, *supra* at § 17–4, pp. 669–71, who take the position that while Comment 3 purports to "reject" the trader rule, their view is to say the section "narrows" the rule; that is, that the burden of proof of lack of damage or loss would be on the bank when the wrongful dishonor of a customer's check results not from mistake or

---

5. Comment 3 to U.C.C. 4–402.

"3. This section rejects decisions which have held that where the dishonored item has been drawn by a merchant, trader or fiduciary he is defamed in his business, trade or profession by a reflection on his credit and hence that substantial damages may be awarded on the basis of defamation 'per se' without proof that damage has occurred. The merchant, trader and fiduciary are placed on the same footing as any other drawer and in all cases of dishonor by mistake damages recoverable are limited to those actually proved."

inadvertance but from the willful action of the bank.

Contrary to this approach, however, other courts and authors have given efficacy to the rejection of the trader rule in Comment 3 of U.C.C 4–402 without engaging in the White & Summers' distinction between wrongful dishonor caused by mistake and that stemming from willful action. *Continental Bank v. Fitting*, 114 Ariz. 98, 559 P.2d 218 (Ariz.App.1977), held that liability for wrongful dishonor of a check was limited to damages actually proved. To reach the result, that court ruled that a prior case, *Valley Nat'l Bank v. Witter*, 58 Ariz. 491, 121 P.2d 414 (1942), which recognized the trader rule in Arizona was no longer controlling in the face of that legislature's enactment of U.C.C. 4–402 [A.R.S. § 44–2628]. *See also First Nat'l Bank of Bellaire v. Hubbs*, 566 S.W.2d 375 (Tex.Civ.App.1978); *Bank of Louisville Royal v. Sims*, 435 S.W.2d 57 (Ky.App.1968). As is stated in 5A Michie, Banks and Banking, Ch. 9, § 243a at p. 641–2:

"Depositor a Merchant or Trader.

Formerly the rule was, if a depositor, whose check was dishonored by a bank when he had funds on deposit sufficient to meet it, was a merchant or trader, it was presumed, without further proof, that substantial damages were sustained, and such damages could have been recovered, even though the refusal was caused by mistake, and there was no evidence of special damage or of ill will or malice and notwithstanding the depositor was a corporation. This rule proceeded upon the fact, commonly recognized, that the credit of the person engaged in such a calling was essential to the prosperity of his business, and the dishonoring of his check was plainly calculated to impair it and to inflict a most serious injury. In common opinion, substantial damage was the natural and probable consequence of the act, and therefore a substantial recovery

could have been had without pleading or proof of special *injury* .... *This is no longer the rule because the Uniform Commercial Code rejects the decisions where the merchant and trader were placed in a special position when a bank wrongfully dishonored an item. In all cases for wrongful dishonor by a bank, damages are limited to those actually proved or proximately caused by the dishonor.*" (Emphasis added.)

In light of the Idaho Legislature's enactment of the U.C.C. and under our interpretation of the language of the section here involved, it is the conclusion of the court that the dicta in *First Piedmont Bank & Trust Co. v. Doyle, supra,* is wrong and that portion of the decision to the extent that its discussion of I.C. § 28–4–402 is inconsistent with this opinion is disavowed.

■ It is the court's conclusion that I.C. § 28–4–402 requires the bank's customer to introduce evidence of damages proximately caused by the bank's wrongful dishonor of its check in order to recover compensatory damages. *See, Joler v. Depositors Trust Co.,* 309 A.2d 871, 877 (Me.1973); *Loucks v. Albuquerque Nat'l Bank, supra,* 418 P.2d at 198. The jury must be so instructed. If the trier of fact thereafter finds, by a preponderance of the evidence, that the customer was injured as a proximate result of the bank's wrongful dishonor, it should award such damages as it shall find to be reasonable compensation for the injury proved. Evidence of the exact dollar amount of damages resulting from the injury is not necessary to support a compensatory award. *Meinhart v. Farmers' State Bank, supra,* 259 P. at 701. Rather, the amount of damages is to be determined by the sound discretion and dispassionate judgment of the jury. *Loucks v. Albuquerque Nat. Bank, supra.*

Instruction no. 22 [6] correctly placed the "burden of proof" on the respondent as to

---

**6.** Instruction no. 22:

"If you decide that the defendant wrongfully returned a check, you must then fix the amount of money which will reasonably and fairly compensate plaintiff for any of the fol-

lowing elements of damage proved by the plaintiff by a preponderance of the evidence to have resulted from the wrongful return of a check:

the amount of damages, as well as the burden of establishing causal connection between the wrongful return of a check and the damages. Instruction no. 23, however, requires that "the Defendant [appellant] has the burden of proving that the Plaintiff [respondent] has not had its business and credit standing damaged." This latter instruction conflicts with the correct statement of law in Instruction no. 22, and we cannot say that the jury award of $20,000 compensatory damages was not based on, or influenced by, Instruction no. 23.

■ We have previously held that where instructions are given which are contradictory on material matters, as Instructions no. 22 and 23 were here, the conflict between them and the resultant ambiguity and uncertainty constitutes prejudicial error and requires reversal. *Ossmen v. Commercial Credit Corp.*, 72 Idaho 355, 365, 241 P.2d 351 (1952). The argument posed by the respondent that the other instructions set forth the correct rule of law on burden of proof and therefore Instruction no. 23 can be ignored is not a correct statement of the law. A materially incorrect statement of law in one instruction cannot be cured by a correct statement in another instruction. *Pigg v. Brockman*, 85 Idaho 492, 502, 381 P.2d 286 (1963). As this court noted in *Cook v. Lammy*, 73 Idaho 445, 253 P.2d 244 (1953), the conflict between the improper instruction and the correct rule in another instruction would necessarily tend to confuse and mislead the jury, and it would be impossible to tell which statement of the law they followed since both came from the court and presumably carried equal weight before the jury. 73 Idaho at 449, 253 P.2d at 246 citing *Shallis v. Fiorito*, 41 Idaho 653, 240 P. 932 (1925). *Accord, Hall v. Corp. of Catholic Archbishop of Seattle*, 80 Wash.2d 797, 498 P.2d 844, 849 (1972); *Smith v. Rodene*, 69 Wash.2d 482, 418 P.2d 741, 744 (1966). We therefore reverse the $20,000

compensatory award and remand this case for a new trial on the issue of whether respondent was injured as a proximate result of appellant's wrongful dishonor of exhibits 6A, 7, 8, 9, 10, 11, 12 and 13 (the first series of checks). If the jury finds that respondent was injured, and that such injury was proximately caused by appellant's wrongful dishonors, it should award respondent such damages as it finds to be fair and reasonable compensation for the injury proved.

Appellant bank next presents a double issue for resolution, i. e., whether the issue of punitive damages should have been submitted to the jury, and if so, whether the award of $30,000 was excessive. It is to be noted, however, that appellant does not challenge the phraseology of the instruction given by the trial court on punitive damages, other than arguing it should not have been given at all.

■ I.C. § 28–4–402 provides "A payor bank is liable to its customer for damages proximately caused by the wrongful dishonor of an item." This provision has reference to "compensatory damages" which are distinct from "punitive damages" and does not expressly allow for awards of punitive damages. However, I.C. § 28–1–103 provides in part that "[u]nless displaced by the particular provisions of this act [the U.C.C.], the principles of law and equity ... shall supplement its provisions" and I.C. § 28–1–106(1) states in relevant part that "penal damages may [not] be had except as specifically provided in this act or by other rule of law." Thus, if a customer can recover punitive damages for wrongful dishonor under the common law of its jurisdiction it will not be precluded from their recovery by I.C. § 28–4–402. *Kendall Yacht Corp. v. United California Bank*, 50 Cal.App.3d 949, 123 Cal. Rptr. 848 (1975); *Loucks v. Albuquerque Nat'l Bank, supra; Northshore Bank v. Palmer*, 525 S.W.2d 718 (Tex.Civ.App.1975).

---

1. the amount of money which will compensate plaintiff for any injury proximately caused to its credit and business standing; and

2. the amount of money which will compensate plaintiff for the reasonable expenses

proximately caused by defendant's wrongful return of the check."
This instruction was based on appellant's requested Instruction no. 4.

In Idaho, punitive damages are recoverable in a tort action if the evidence clearly shows "that the action of the wrongdoer is wanton, malicious, or gross and outrageous, or where the facts are such as to imply malice and oppression . . ." *Unfried v. Libert*, 20 Idaho 708, 728, 119 P. 885 (1911). Punitive damages may be awarded for breach of contract if there is clear evidence of fraud, malice or oppression, or if there is other sufficient reason for doing so. *Boise Dodge, Inc. v. Clark*, 92 Idaho 902, 453 P.2d 551 (1969). I.C. § 28-4-402 does not specify whether a bank's liability for dishonor is based on the theory of breach of contract or tort. I.C. § 28-4-402, Comment 2. Nonetheless, the court is of the opinion that in this action, where the record reflects that a "hold" was placed on respondent's bank account with no prior consultation by the bank with its attorney, or with no inquiry or notice by the bank to respondent, there was sufficient evidence to justify submission of the issue of punitive damages to the jury under either theory, and the court finds no error by the trial court in submitting this issue to the jury.

As previously discussed, the judgment in this action awarding compensatory damages must be reversed, and thus the judgment awarding punitive damages must likewise be reversed for further proceedings; for this court has adhered to the concept that there must be some reasonable relationship between the amount of compensatory damages awarded and the amount of the punitive damage award that will be sustained when attacked for being excessive. *Williams v. Bone*, 74 Idaho 185, 259 P.2d 810 (1953); *Driesbach v. Lynch*, 74 Idaho 225, 259 P.2d 1039 (1953); *see also Jolley v. Puregro Co.*, 94 Idaho 702, 496 P.2d 939 (1972). When the base against which punitive damages is to be measured is reversed for further proceedings, of necessity the award of punitive damages likewise must be reversed for further proceedings.

It is recognized that the phrase "reasonable relationship" as referred to above is an imprecise one for measurement of punitive damages as against actual damages. In *Cox v. Stolworthy*, 94 Idaho 683, 496 P.2d 682 (1972), and *Jolley v. Puregro Company, supra*, this court endeavored to remove a little of such uncertainty. Language pertinent here is to be found in *Jolley v. Puregro*, 94 Idaho at 708–709, 496 P.2d 939:

"As this court noted in *Cox v. Stolworthy, supra*, other authorities recognize that the predominant purpose of exemplary damages is to deter the defendant and others similarly situated from indulging in comparable conduct in the future. Any vindictive or vengeful punishment aspect of an exemplary damages award is de-emphasized by this line of authority. *Cox v. Stolworthy, supra*; See C. Morris, 'Punitive Damages in Tort Cases,' 44 Harv.L.R. 1173 (1931). We prefer to accentuate those cases which define the purpose of exemplary damages as a deterrent to the defendant and others from engaging in similar conduct in the future. We concede that any exemplary damages assessed against a defendant will appear to him to be punishment. However, we feel that the courts in these civil cases should be motivated primarily by a purpose of deterrence and not by a purpose of punishment. In other words, the assessment of exemplary damages should be prompted by the court's or jury's desire to assure, to the extent possible via the imposition of a monetary penalty, that similar conduct does not occur in the future. Punishment, per se, should be left to the criminal law. D. Hodel [44 Ore. L.R. 175] at 178–82." (Footnote omitted.)

This statement is later followed by the admonition in *Jolley v. Puregro Company*:

"By our specific attention to the facts in *Boise Dodge [Boise Dodge, Inc. v. Clark*, 92 Idaho 902, 453 P.2d 551 (1969)] and *Village of Peck [Village of Peck v. Denison*, 92 Idaho 747, 450 P.2d 310 (1969)] cases, we do not preclude the possibility that there may be other similar situations in which aggravating and dire circumstances necessitate the departure from the general rule of exemplary damages in *Cox v. Stolworthy*. However, the

awarding of additional exemplary damages, in excess of those provided in that general rule, should be limited to the most extreme circumstances such as the calculated commercial fraud in *Boise Dodge* and the threat to the health, safety and welfare of a large number of persons represented in the *Village of Peck* case." 94 Idaho at 711, 496 P.2d 939.

Since we are remanding this case in order that the jury may reconsider the amounts to be awarded as compensatory and punitive damages, we need not address appellant's claim that the award of punitive damages is excessive and the award of compensatory damages is not supported by the evidence. Also, we find no abuse of discretion on the part of the trial court in refusing to submit appellant's requested special interrogatories to the jury, since evidence of the exact dollar amount of damages resulting from appellant's wrongful dishonors is not necessary to support an award of compensatory damages.

Finally, appellant urges this court to grant a new trial on the ground that counsel for respondent violated I.C. § 10–111. That statute forbids the amount of general damages sued for to be disclosed to the jury. This statute was not violated during the trial of this case and appellant's argument to the contrary is without merit.

This court declines to award either party attorney fees on appeal on the basis of the guidelines set forth in *Minich v. Gem State Developers, Inc.*, 99 Idaho 911, 591 P.2d 1078 (1979).

Judgment reversed and cause remanded for further proceedings consistent with this opinion. Costs to appellant.

DONALDSON, C. J., and BAKES, J., concur.

SHEPARD, Justice, dissenting.

I disagree with the result obtained by the majority opinion and would affirm the entire judgment of the trial court.

In my judgment, the majority's consideration of the "trader rule" and its continued existence or non-existence is much ado about nothing. The majority states, "Evidence of the exact dollar amount of damages resulting from the injury is not necessary to support a compensatory award." Thereafter, in conclusion, the majority states:

"Also, we find no abuse of discretion on the part of the trial court in refusing to submit appellant's requested special interrogatories to the jury, *since evidence of the exact dollar amount of damages resulting from appellant's wrongful dishonors is not necessary to support an award of compensatory damages.*"

I find that language of the majority impossible to reconcile with its abrupt rejection of the trader rule. Evidently, once a depositor has stated, "in my opinion, my credit standing and reputation were damaged," a jury may award damages without any evidence of a specific dollar amount as foundation therefor much as a jury without specific foundation therefor must nevertheless award a specific dollar amount for the pain and suffering of a personal injury plaintiff or to compensate for the loss of reputation of a plaintiff who has been libeled or slandered. In truth, I see little difference obtained by the "rule" announced by the majority today and the results obtained by the trader rule.

Further, I do not view instruction No. 23 as does the majority. I find nothing therein which conflicts with the majority rule announced today, particularly in view of the language of that instruction "then the plaintiff is not required to prove *any particular amount of damage for harm to its credit or business standing* * * *."

As amply pointed out in the dissent of Bistline, J., the plaintiff here carried any required burden or proof by demonstrating that its credit standing and reputation had been damaged and obviously, to me at least, the jury assigned a value to that damage in accord with the theory announced by the majority today.

I must note lastly that the majority refuses to address the appellant's claim that

the award of punitive damages is excessive. In my judgment, punitive damages awarded by the jury were not excessive. Further, in my judgment, the circumstances in the instant case clearly indicate that the actions of the defendant-appellant bank were, at least, wanton, gross, outrageous and they evidence oppression. To me at least, insofar as the record reveals, the bank gave not the slightest heed or consideration for its depositor, but rather sought to protect itself from a possibility, so remote as to be almost non-existent, that it might incur some type of liability. In this age of computers and other sophisticated electronic devices used by the banking community, the public may perhaps be required to expect and tolerate mistakes and error which enrage. However, I see no reason why the public need expect or tolerate acts of a deliberate and wilful nature performed by an official in the hierarchy of banking which damage, if not destroy, the credit and financial reputation of a depositor. I submit that a bank must anticipate that the result of such conduct may well be the assessment of punitive damages.

BISTLINE, Justice, dissenting.

The jury verdict and judgment thereon should be affirmed.

I.

The plaintiff commenced this action in December of 1975 for damages allegedly caused when plaintiff's monies on deposit in defendant bank were not applied to plaintiff's checks drawn on the account. The complaint amply set forth the details which simply were that the bank acted negligently, wrongfully, willfully, unlawfully and maliciously in impounding the plaintiff's funds and at the same time returning plaintiff's business checks drawn on those funds. Before the case came on for trial in February of 1977 the parties and the trial court had the benefit of this Court's opinion in the case of *First Piedmont Bank and Trust Co. v. Doyle*, 97 Idaho 700, 551 P.2d 1336 (1976).

Therein the Court *with all concurring* cited White & Summers, Uniform Commercial Code (2d ed. 1972) § 17–4, p. 573, for the proposition:

"that the burden of proof of lack of damage or loss is on the bank when it *dishonors* a customer's check. The rationale therefore is stated 'the primary reason for the recognition of this presumption is that wrongful dishonor renders the existence of some harm to the customer's credit and business standing *so probable* that it makes legal sense to assume the existence of such harm unless and until the adversary comes forward with some evidence to the contrary.'" *Id.* at 703.

Today, with the ink scarcely dry on the *Piedmont* opinion, the Court issues a new opinion which holds that the foregoing statement in *Piedmont* was dicta. Moreover, says the Court, it was bad dicta as well. The Court then perceives that it must overrule such dicta, and does so. Without demonstrating any sound reasoning for so doing, the Court also proceeds to discard the White & Summers analysis of U.C.C. 4–402, which was set forth in *Piedmont*. The White & Summers analysis is replaced by the bare conclusion that I.C. § 28–4–402 requires a bank's customer to introduce evidence of damages proximately caused by the bank's wrongful dishonor of its check in order to recover compensatory damages.

From that conclusion, the Court's opinion proceeds to examine the trial court's given instructions and finds that instruction no. 22 was correct in that it properly placed on the plaintiff the burden of establishing that plaintiff suffered damages which proximately resulted from the wrongful dishonor of its checks. The Court's opinion then finds it either inconvenient, inexpedient, or embarrassing to mention that the plaintiff introduced at trial rather substantial evidence from which the jury could have found, as it obviously did, that it was damaged by the wrongful dishonors. At the bank's request the jury was required to respond to a special verdict, the first question of which specifically put to the jury the issue of dishonor, proximate cause, and resultant compensatory damages if any:

"1. What is the amount of compensatory damages, if any, that were proximately caused to plaintiff as the result of defendant's dishonor of exhibits 6A, 7, 8, 9, 10, 11, 12 and 13?

"Answer: $20,000."

Eleven jurors signed that verdict. As to the quantum of evidence which brought those jurors to that verdict, concerning which much more must hereinafter be stated, at this point it suffices to say that the plaintiff's brief with accuracy summarizes the same, pointing out that after the bank locked up plaintiff's checking account, and during the period it yet continued to accept plaintiff's further deposits in excess of $39,-000, freezing these, too, and continuing to dishonor checks which plaintiff drew on its account with defendant bank, plaintiff's line of credit for flooring its boat inventory was reduced from $180,000 to $75,000. An officer from Farmers & Merchants Bank of Opportunity, Washington, testified that as a result of the dishonor of a check of plaintiff's which had been deposited with it, there was a total suspension of credit for approximately 30 days at a critical time, this happening at the time boats are being sold and additional boats are being floored to maintain the inventory. Demonstrating the chain reaction attendant to such dishonors, and lack of any notification which would afford some opportunity to take preventive measures with the payees of such dishonored checks, the bank officer testified that he in turn had called two of plaintiff's key suppliers to inform them that plaintiff would no longer have flooring. As I point out, a summary of this rather devastating evidence is readily found in the plaintiff's brief.

The brief of defendant bank engages in facile and futile argument which makes no contention that such was not substantial and competent evidence, urging only (with appalling success to a majority of this Court) that:

"In the present case, evidence was introduced to show that plaintiff's credit and business standing were not injured. Farmers & Merchants Bank increased the plaintiff's credit line from $75,000 to $150,000 some three weeks after the alleged wrongful dishonor of the checks."

This argument by the bank is not only frivolous, but outrageous as well, and not entitled to the tacit approval of any court. It did not impress the trial court. It is true that after the smoke cleared away following the wrongful dishonor of plaintiff's checks, and the damage inflicted on plaintiff, the Farmers and Merchants Bank did double the line of credit which had existed *prior* to the wrongful dishonors, and it is true that this was three weeks, plus a few days, thereafter. In the interim, however, the damage had been done, and evidence thereof was submitted to the jury and the jury passed on it.

Notwithstanding all of the foregoing, the Court's opinion, finally reaching what might appear to be the main theme of its content, declares fault in the final portion of instruction no. 23 which stated that "the Defendant has the burden of proving that the plaintiff has not had its business and credit standing damaged." Branding the instruction as erroneously in conflict with Instruction No. 22, and ignoring that if it were in error or incomplete that the error was harmless, the Court's opinion declares that it must reverse and remand for a new trial to determine "the issue of whether the respondent was injured as a proximate result of appellant's wrongful dishonor ..." Wholly ignored by the Court is that such is exactly what the jury did decide on the form of special verdict submitted by the trial court responsive to the bank's request, and also set the damages which it felt were just. Totally incomprehensible is the negative approach of the Court, a Court which supposedly will not presume error, and supposedly adheres to the rule that the judgment below is entitled to a presumption of validity. The Court should be saying that it cannot see how the questioned language in instruction no. 23 can be said to have adversely influenced the jury. More aptly the Court would indulge in the time-honored precept that instructions are not singled out for critical observation, but that all instructions will be considered as a whole in deter-

mining whether there has been any error which resulted in less than a fair trial. The Court's opinion makes *no* mention of the instruction which submitted and instructed on the use of the special verdict.

Having concluded against the jury's assessment of compensatory damages, the Court's opinion then gets down to what this case is all about, and that which in my opinion has led the Court astray and caused it to be remiss in failing to apply the usual and proper rules for appellate review. The Court holds that the jury's assessment of $30,000 punitive damages must also be reversed, this notwithstanding the Court's recognition, and that of the bank as well, that in any event, and under any view of the law, the plaintiff is entitled to nominal damages. Yet the Court's opinion facially does agree that punitive damages are recoverable for the type of wrong here perpetrated by the bank. Notwithstanding its proclamation that *Cox v. Stolworthy*, 94 Idaho 683, 496 P.2d 682 (1972) and *Jolley v. Puregro Company*, 94 Idaho 702, 496 P.2d 939 (1972) are said to state the modern law on punitive damages in Idaho, the Court harks way back to *Williams v. Bone*, 74 Idaho 185, 259 P.2d 810 (1953) for the proposition that a punitive damage award when under attack will be sustained only if there "be some reasonable relationship between the amount of compensatory damages and the amount of the punitive damage award." Having vaporized the jury's award of compensatory damages, *a fortiori*, holds the Court, the punitive damages, too, must be reexamined by another jury at another trial. Notwithstanding this quick and merciful disposition of all damages awarded the plaintiff, the Court's opinion indulges in further discussion of punitive damages. Following a statement that the "reasonable relationship" which according to *Williams v. Bone, supra,* years ago declared should be found to exist vis a vis compensatory and punitive damages, the Court's opinion (for the benefit of the district court on retrial, I surmise) quotes extensively from *Jolley v. Puregro, supra,* the opinion in which while adding absolutely nothing, regurgitated that which had been said by the Court just

a few days earlier in *Cox· v. Stolworthy, supra,* wherein the Court on its own volition, and responsive to nothing urged by the parties in that last mentioned case, greatly unsettled previously well-settled law in the field on punitive damages—only a short, short time after the Court had handed down its well received opinion in *Boise Dodge, Inc., v. Clark,* 92 Idaho 902, 453 P.2d 551 (1969).

It might be enough to sum up the Court's disposition as simply being a totally unwarranted reversal of the jury's verdict because of the giving of one single instruction so construed by the Court as to require reversal. It might be well to quizzically note that the Court orders the cause retried so the jury can determine whether the plaintiff was damaged and, if so, to set the damage, adding only that these precise issues have been presented to a jury, and have been decided. It might suffice to add that any fault in the instruction complained of, and I say there was none, cannot reasonably be called other than harmless error. The issues at stake, however, are much broader than a correct determination of the instant case, and in my opinion require a careful detailing of the evidence which was the basis of the jury's determination, and also require the closest scrutiny of the applicable law—especially where the Court so soon after *Piedmont* finds itself overthrowing that which it said there.

## I. *Piedmont.*

That the Court so soon after issuing its opinion in *Piedmont* so readily strikes down that portion approving of the White & Summers analysis of § 4–402 of the Uniform Commercial Code will startle the trial bench and bar. The bench and bar may pause to wonder how soon that portion of White & Summers relied on in today's opinion will be discarded. Hopefully this will not happen, but that it is happening today is much cause for concern. This is especially true where the Court need not be taking such drastic and unprecedented action, and should be more mindful than it is of the demoralizing effect on those trial judges

and practitioners of the law who like to believe that there can be a science to jurisprudence.

First of all, what White & Summers wrote with relation to § 4–402 is sound, and the Court having accepted it in *Piedmont*, should be loathe to now deny it. Second, there is no need to do so, this for the simple reason that the trial court in this case *did not* instruct the jury that a plaintiff whose check has been wrongfully dishonored is entitled to a presumption that he has been substantially damaged. The court properly could have so instructed, but it did not.

### A. *The Trial Court's Instructions Reviewed.*

There can be no honest doubt but that in this case the plaintiff assumed the burden of proving causation, and that the trial court's instructions informed the jury that compensatory damages could be awarded only if plaintiff was injured as a result of the bank's dishonor of the checks which were exhibits 6A, 7, 8, 9, 10, 11, 12 and 13. The special verdict submitted to the jury, a portion of which is set forth above, clearly told the jury that "compensatory damages, *if any*," had to result from and be proximately caused by the bank's dishonor of those checks. In the quoted portion in the foregoing sentence I have emphasized the words "if any." Here the trial court carefully avoided leaving any thought whatever with the jury that there was any suggestion or inference, let alone presumption, of substantial damages, which flowed from the wrongful dishonors. And, as the Court's opinion concedes, instruction no. 22 placed upon the plaintiff the burden of proving by a preponderance of the evidence the elements of claimed damages said to have resulted from the wrongful dishonors. Included in that instruction was the specific

language which laid at plaintiff's door the obligation to establish *injury proximately caused* to its credit and business standing. In that instruction the trial court again carefully avoided telling the jury that the plaintiff had been injured by the wrongful return of the checks, making use of the word "any" as an adjective modifying the word injury. (How differently the instruction would read had the trial court instructed the jury to return damages in "the amount of money which will compensate plaintiff for *the* injury proximately caused to its credit and business standing.") Instruction no. 22, as given by the trial court left with the plaintiff the burden of proving both that there was injury to its credit and business standing, and that it was caused by and resulted from the wrongful dishonors.

Instruction no. 24[1] was far more favorable to the bank than it should have been. Following instructions no. 22 and 23, it told the jury that if it found "some damages" occasioned to plaintiff by the wrongful dishonor, "but no measurable pecuniary injury," it should relegate the plaintiff to nominal damages. This was clearly an invitation to the jury that it could fall back to an award of nominal damages if it had trouble in arriving at fair and just compensation for the injury done. As the Court's opinion points out, with which I agree, "[E]vidence of the exact dollar amount of damages resulting from the injury is not necessary to support a compensatory award." The instruction, taken with the others given to the jury, further evidences the trial court's placing of the burden of proof on the plaintiff.

Yet, the Court's opinion seizes on one sentence of instruction no. 23, and says of it that it conflicts with instruction no. 22. This instruction absolutely does not, as the Court's opinion suggests, set forth "the

---

1. Instruction No. 24:

"If you find that defendant wrongfully returned any check, and if you find that plaintiff suffered some damages but no measurable pecuniary injury from the wrongful return of any check, you may award a verdict for plaintiff for nominal damages. Nominal damages are given, not as an equivalent of

the wrong, but in recognition of a technical injury and by way of declaring a right and are not the same as damages small in amount. Usually the amount awarded as nominal damages is a trifling or nominal sum, although the amount may vary, depending on the circumstances of the case."

common law rule, under which a 'merchant or trader' was allowed to recover substantial damages for wrongful dishonor without proof of actual injury." An analysis of instruction no. 23 is in order, and does not present a task of any difficulty.

The instruction consists of but two separate paragraphs. The first paragraph, a single sentence, properly advised the jury that the plaintiff was claiming "damages for loss of its credit and business" as a result of the wrongful dishonors. Surely this first paragraph presents no problem to anyone. The second paragraph is in two connected sentences. The first merely told the jury in language almost identical to that used in the Court's opinion that the plaintiff, for the wrongful dishonors and harm to its credit and business standing, was *not required to prove any particular amount* of damage. No other construction is possible. Substantial damages are not mentioned. Equally unmentioned is any language therein which would have told the jury that plaintiff was entitled to recover substantial damages for a wrongful dishonor *without being required to prove actual injury.* The "trader rule" and its presumption of substantial damages simply was not utilized, nor even mentioned. Something has to be said for the capabilities of the trial judge who presided at this jury trial, and it cannot be gainsaid but that he could have given an instruction embodying that presumption had he decided so to do, or had such an instruction been requested.

The balance of the second paragraph of instruction 23 simply told the jury that if the bank wanted to minimize the damage award by showing that the plaintiff had not in fact had its business and credit standing damaged (injury), it could do so and bore the burden of presenting evidence on that score. Here again was no language which gave the plaintiff the benefit of the "trader rule." The jury was instructed that the plaintiff bore the burden of proving injury to his credit and business standing, and that he did not have to introduce evidence to establish the amount of damages in dollars and cents. This is exactly what the Court's opinion declares should be done on a new

trial. And, although the Court fails to give such directions, it should also be saying that on a retrial the bank is entitled to present evidence, as it did here, that plaintiff's business and credit standing was not injured by the wrongful dishonors.

Totally overlooked in the Court's opinion is the fact that neither party submitted an instruction on the trader's rule, and none was given. Totally overlooked by the Court is the fact that the parties and the trial court were all conversant with the Court's statement in *Piedmont,* and with *Piedmont's* reliance on White & Summers. But, above all that, the Court overlooks the singular fact that notwithstanding *Piedmont* and its probable application to this case, the plaintiff did not at trial rely on the presumption of the trader's rule, but it was the *defendant* who went into trial possessed of (what now turns out to be) the strange notion that that which the Court said in *Piedmont* was the law in Idaho, as it apparently is in all jurisdictions.

Reflective of the parties' theories of cases and any involvement of the "trader rule" are the brief opening statements of counsel prior to the taking of any evidence. Counsel for plaintiff explained to the jury that plaintiff's evidence would show injury caused by the dishonors which injury manifested itself in the suspension of his line of credit with the Farmers and Merchants Bank in the Spokane Valley. Counsel for the bank responded with an acknowledgment that "it is true as plaintiff said that Farmers and Merchants Bank, a Washington bank, at which the plaintiff corporation, Yacht Club Sales and Service, was banking, learned of the return of one or two of these checks. It is also true that Farmers and Merchants Bank, after this time, altered Mr. Harris's credit terms. In fact, the evidence will show that at the time that these checks were returned, he had approximately a $75,000 line of credit. *The evidence will further show that Farmers and Merchants Bank doubled his credit line after we returned these checks, within a three week period after we returned these checks.*" As mentioned much earlier in this

opinion, it is on the basis of this last statement, that the bank in its brief in this Court contends that the plaintiff cannot be said to have established any injury flowing from the wrongful dishonors. At this point, however, the statement signifies the bank's understanding that it was assuming the obligation of attempting to bring forth evidence with which to establish to the jury's satisfaction that no injury was caused by the dishonors, and thus, in accordance with instruction no. 24, which it requested, the plaintiff could recover only nominal damages. It is not possible to review the requested instructions, the opening statements, and the given instructions, without coming to the conclusion that the "trader rule" was not involved in the trial of this controversy. That is not to say that it could not have been. It is to say that the plaintiff did not rely upon any presumption of substantial damages which attends to the wrongful dishonor of business checks, but went about the business of proving that there was in fact injury to its credit and business and reputation. It is to say that the bank attempted to disprove any such injury by the introduction of testimony that plaintiff's line of credit was in fact increased, thereby disproving any such claimed injury, and damages to be assessed therefor.

Simply put, the Court's conclusion that instruction no. 23 interjected the "trader rule" into the case, and to the bank's prejudice, is highly fallacious. And that it did not do so is easily discernible from the record with which we are presented. I am not at all able to believe that the Court sincerely entertains the opinion that, notwithstanding the instructions taken as a whole, the final sentence in instruction no. 23 could be taken by any of the jurors as placing on the bank the burden of persuading the jury. Seldom is the burden of proving a negative placed upon a party, and it wasn't done in this case. But that is not to say that the burden of proof, meaning the "burden of producing evidence," might not shift to a party in view of the effect of a presumption. This Court has heretofore dealt with the distinctions between the terms "burden of proof," "burden of persuasion," and "burden of producing evidence," this last mentioned sometimes being referred to as the "burden of going forward." In the recent case of *Keenan v. Brooks*, 100 Idaho 823, 606 P.2d 473 (1980), the specially concurring opinion of Bistline, J., with Donaldson, C. J., concurring, pointed out that the term "burden of proof" subsumes two distinct procedural problems, and may be in reference to the "burden of persuasion," or the "burden of producing evidence." 100 Idaho at 827, 606 P.2d at 477. In that opinion it was further noted that, "although the term 'burden of proof' can be used interchangeably with the other two terms because it incorporates them both, such use often leads to confusion." *Id.* Note was also there taken of the comment of Professor Bell, Handbook of Evidence for the Idaho Lawyer, 215–17 (2d ed. 1972), "While the bulk of the decisions in Idaho treat the two burdens as one and fail to make the differentiation ... [i]t would seem that a careful demarcation between the two burdens would make the Idaho decisions of greater value as guides to the lower courts." *Id.*

Today's opinion by the Court adds to the bulk which fail to observe the distinction. The Court's shortcoming in this regard is inexcusable where the bank's brief well serves to remind of the distinction. The bank, after stating that it did introduce evidence "to show that plaintiff's credit and business standing were not injured," having reference to testimony that "Farmers and Merchants Bank increased plaintiff's credit line from $75,000 to $150,000 some three weeks after the alleged wrongful dishonor of the checks," then urges: "This evidence is sufficient to overcome any presumption and therefore the burden of proof (burden of producing evidence) is on the plaintiff, together with the burden of persuasion." The bank thus demonstrates an acute awareness of the proper terminology, and its proper application, which should be remarked on where *Keenan v. Brooks, supra*, was not announced until some seventeen months after the bank filed its brief in this

case.[2]  Had the plaintiff here relied on the presumption which does attend the "trader rule," the bank would be absolutely correct in its belief that it was then necessary for it to introduce evidence to overcome the presumption—which is to say that the presumption, if relied upon, would have cast upon the bank the duty of coming forward with enough evidence to overcome it, following which the burden of producing evidence would become plaintiff's, and the plaintiff in any event would also have to carry the burden of persuasion in order to carry the day.  However correct the bank is in its theory, the plaintiff did not stand on the presumption, but did initially come forward with evidence which, should the jury have chosen to accept it, as was the right of the jury, did establish injury to plaintiff's credit and business reputation—notwithstanding the evidence adduced by the bank under its contention that such showed no injury.  The main point is simply that although the bank candidly shows an awareness of the distinctions which attach to the broad term "burden of proof," the Court remains blind thereto, insisting that the last few words of instruction no. 23 placed the burden of proof (by which it must mean persuasion) on the bank—notwithstanding that the other instructions, and all of the instructions taken as a whole show that the jury was instructed in this case that it was the plaintiff who carried the burden of proving the wrongful dishonors and resultant injury to the plaintiff's credit and business reputation.

Relating backward in time to immediately *after* the trial, we gain additional insight into the presentation of the bank's theories of the case over that provided by the opening statement of the bank's counsel and the brief filed in this Court.  In a brief submitted to the trial court, the bank argued

there much as it does in this Court, evidencing its understanding all along that the burden of proof referred to in instruction no. 23 had to do with the presumption, with the burden of proof (going forward with evidence to overcome the presumption) falling on the bank which wrongfully dishonors its customer's checks:

"The Court instructed the jury (Instruction No. 23) that the plaintiff was not required to prove any particular amount of damage or harm to its credit and business standing, and that defendant has the burden of proving that the plaintiff has not had its business and credit standing damaged.[3]

"The basis of this instruction appears to be the dicta in *First Piedmont Bank & Trust Company v. Doyle*, 97 Idaho 700, 551 P.2d 1336 (1976), wherein the court, citing *White & Summers*, Uniform Commercial Code (2nd Ed. 1972) § 17–4, p. 573, stated that the burden of proof of lack of damage or loss is on the bank when it dishonors a customer's check.

"However, White & Summers were quoting from the case of *American Fletcher National Bank & Trust Company v. Flick* [146 Ind.App. 122], 252 N.E.2d 839 (Ind.App.1969).  A copy of that opinion is in the appendix hereto commencing with page 1.  A reading of that case makes it clear that only a presumption of some harm to a customer's credit and business standing is present until evidence to the contrary is produced.  The reason for the presumption is to prevent a directed verdict against the plaintiff on the issue of harm.  Once evidence to the contrary is introduced, the reason for the presumption ceases to exist.  *Thus, when using the words 'burden of proof' in this context, the court means the burden of producing evidence, and not the burden of persuasion.*"

*Mutual Life Insurance Co.*, 91 Idaho 719, 721, 429 P.2d 849, 851 (1967).

---

2.  Able counsel for the bank without doubt were aware of other recent decisions of the Court which explained "burden of proof," "burden of persuasion," and "burden of going forward." These cases, mentioned in *Keenan v. Brooks, supra*, are *Cole-Collister Fire Protection District v. City of Boise*, 93 Idaho 558, 569, 468 P.2d 290, 291 (1970); *Harman v. Northwestern*

3.  The bank here mistakenly copied the instruction.  As here written the instruction supposedly stated that "plaintiff was not required to prove any particular amount of damage *or* harm"—a far cry from the actual reading: "any particular amount of damage *for* harm."

I have supplied the emphasis. Counsel are at liberty to, and do argue the court's instructions in making final summations. Counsel for the bank, who so full well knew the meaning of burden of proof as used in the last sentence of instruction no. 23, certainly were free to explain that instruction to the jury if the doing of such was thought to be necessary.

Clearly the bank knew what was being referred to in instruction no. 23. Yet, so far as can be found from the record, the bank at the instructions conference did not register any thought that the instruction might not be all that clear to lay jurors, nor does it appear that the bank requested or offered any instruction which would further explain to the jury that the burden of proof referred to in instruction no. 23 as it applied to the bank had to do only with the bank's obligation to come forward with evidence if the plaintiff's evidence did not make out a prima facie case, and/or if the plaintiff had no evidence, or did not choose to present any evidence, and was content to stand on the presumption. As pointed out, although it is quite apparent that the bank's case theory was that it needed to bring in sufficient evidence to overcome the presumption, the plaintiff did not take that tack, and there is not in the record an instruction given or requested dealing with the presumption of substantial damages which the "trader rule" applies to wrongful dishonors. There is no sound basis whatever for the Court's stance that the trial court instructed the jury on the "trader rule," and there exists no reason in this case to cast out the White & Summers analysis of § 4–402 set forth in *Piedmont.*

In reversing the district court judgment based on a jury verdict on the slim grounds stated that instruction no. 23 may have confused the jury, the Court seems oblivious of past opinions touching on the subject of questioned jury instructions. As recently as eight months ago, where at stake were not dollars and cents, but three years of prison time, the Court in response to a contention that the instruction given on the issue of self-defense was almost identical to one earlier rejected by the Court, said: "In-

structions must be interpreted in their context and not read in isolated sentences . . . While the instruction is perhaps, not a model, it is not ambiguous, misleading or erroneous." *State v. Griffiths,* 101 Idaho 163, 610 P.2d 522 (1980). In *Archer v. Shields,* 91 Idaho 861, 434 P.2d 79 (1967), the Court stated that admitted errors in instructing would be held non-prejudical where the evidence presented abundantly justified the verdict. The Court there quoted at length from *Tarr v. Oregon Short Line R. R. Co.,* 14 Idaho 192, 93 P. 957 (1908), concluding with the statement that although a certain instruction should not have been given,

> " 'we are equally satisfied in this case that the appellant has not been prejudiced or injured or damaged on account of the instruction, and we are unwilling to reverse the judgment for that reason.'

"Thus because of the verdict rendered by the jury the errors in instructions and admissibility of evidence claimed by the appellant are deemed non-prejudicial and nonreversible." *Archer v. Shields,* 91 Idaho at 868–69, 434 P.2d at 86, 87.

### B. *Section 4–402 of the U.C.C. and the Trader Rule.*

As pointed out above in Part A, the plaintiff at trial undertook to prove injury to his credit and business reputation just as though he were seeking damages for a wrongful dishonor which was made by mistake. Such being so, anything written in this case about the "trader's rule" would be mere dicta—other than for the Court's false premise that the trial court did give the plaintiff the benefit of the "trader's rule." But the Court has created the issue, has passed on it, has thrust its sword into *Piedmont,* and it becomes necessary to consider whether the Court there was in such grievous error when it rendered that now much-maligned statement:

> "In White and Summers, Uniform Commercial Code (2nd ed. 1972), § 17–4, p. 573, it is noted that the burden of proof of lack of damage or loss is on the bank when it *dishonors* a customer's check.

The rationale therefore is stated 'the primary reason for the recognition of this presumption is that wrongful dishonor renders the existence of some harm to the customer's credit and business standing *so probable* that it makes legal sense to assume the existence of such harm unless and until the adversary comes forward with some evidence to the contrary.' (Emphasis supplied)."

*Piedmont,* 97 Idaho at 703, 551 P.2d at 1339.

As counsel for the bank have pointed out both in the court below and here, the White & Summers' statement by those authors was directly attributable to *American Fletcher National Bank & Trust co. v. Flick,* 146 Ind.App. 122, 252 N.E.2d 839 (1969). The complete paragraph from that case as set forth in White & Summers, is:

"[W]hen a bank wrongfully dishonors its customer's business check there arises a presumption that the customer's credit and business standing is thereby harmed. The function of this presumption is to remove from the customer the duty of going forward with the evidence on this particular injury or harm and thereby avoid a directed verdict against him if evidence on the issue is not produced. The primary reason for the recognition of this presumption is that a wrongful dishonor renders the existence of *some* harm to the customer's credit and business, standing so probable that it makes legal sense to assume the existence of such harm unless and until the adversary comes forward with some evidence to the contrary. (emphasis original)" White & Summers, *supra* § 17–4 at 674.

Viewing side-by-side the quoted excerpt from *Piedmont* and the quoted excerpt where White & Summers quoted *American Fletcher National Bank v. Flick,* any problem with the *Piedmont* language is that it omitted the first two sentences of the quote in White & Summers, paraphrasing the same into saying that in White & Summers "it is noted that the burden of proof of lack of damage or loss is on the bank when it *dishonors* a customer's check." *American Fletcher National Bank v. Flick* did not say

that the burden of proof of lack of damage was on the bank, but did say that the presumption of injury or harm removes from the customer the *burden of going forward with evidence. American Fletcher National Bank v. Flick,* further says, as was carried forward in the *Piedmont* excerpt, that the presumption exists "unless and until the adversary comes forward with some evidence to the contrary."

This has all been pointed out by counsel for the bank, leaving me at a complete loss to understand why the Court's opinion chooses to ignore it. The paraphrasing of the *Piedmont* opinion was unfortunate in not making the nice distinction between the burden of persuasion and the burden of going forward—both of which are encompassed in the more broad term, "burden of proof." But even so, that should not have been any obstacle to the Court where it had theretofore recognized the distinction in *Cole-Collister Fire Protection District v. City of Boise, supra* and *Harman v. Northwestern Mutual Life Insurance Co., supra.* Where the quoted language in the *Piedmont* excerpt referred not once, but twice, to the shifting of the burden of going forward with the evidence, clearly those who concurred in that opinion (and all did) cannot with any grace say today that "burden of proof" as used in *Piedmont* meant burden of persuasion. So viewed, the statement in *Piedmont* is not susceptible to challenge, and it ill behooves the Court to strike it down. Nothing in the U.C.C. mandates such action, and reason and common sense require at least the application of that presumption, when relied upon by a bank's customer whose checks have been wrongfully dishonored.

I.C. § 28–4–402, Section 4–402 of the Uniform Commercial Code, provides:

"Bank's liability to customer for wrongful dishonor.—A payor bank is liable to its customer for damages proximately caused by the wrongful dishonor of an item. When the dishonor occurs through mistake liability is limited to actual damages proved. If so proximately caused and proved damages may include dam-

ages for an arrest or prosecution of the customer or other consequential damages. Whether any consequential damages are proximately caused by the wrongful dishonor is a question of fact to be determined in each case."

The Court's opinion correctly holds that the wrongful dishonors in this case were not mistaken. Although this section declares that a bank's liability for mistaken wrongful dishonor is limited to actual damages, which may include damages for an arrest, prosecution, or other consequential damages, manifestly the section on its face does not purport to deal at all with the damages which may be assessed against a bank for a wrongful dishonor which does not occur through mistake.

Where the drafters of the U.C.C. deliberately chose not to use appropriate language which would abolish the "trader rule," no sound reason appears from anything found in the Court's opinion as to why it should not be retained. The court in *American Fletcher National Bank v. Flick*, contrary to the view of that case taken in the Court's opinion, did not declare that it was reincarnating, adopting, or merely perpetuating the "trader rule." *American Fletcher National Bank v. Flick* goes only so far as to say that wrongful dishonor requires a presumption of *some injury* to the customer's credit and business standing. The Indiana court restricted Flick to nominal damages, not on the basis that he was not harmed, but on the basis that notwithstanding the unrebutted presumption the evidence was insufficient to justify an award beyond anything nominal. Pointedly that court noted 'There is nothing in the record to indicate that the checks caused any action or inaction by any other party." 252 N.E.2d at 847. That case stands only for the proposition that the Indiana courts will apply a presumption of *some harm* (injury) to credit or business reputation. It does not, as the Court's opinion would intimate, require a presumption of *substantial damages*. That the trial court well understood the not insignificant distinction between these two terms is readily apparent. Instruction no. 23 did not purport to instruct at all with

respect to any right in the plaintiff to receive substantial damages. As I keep mentioning, it did, much in the language used in the Court's opinion, advise the jury that the plaintiff was not put to any requirement of proving particular amounts of damages due for harm to credit and business standing, occasioned by the wrongful dishonors.

The Indiana opinion is more to be noted for its quotations from the courts of Pennsylvania and Illinois which are strongly supportive of a presumption of substantial damages for wrongful dishonors not the product of mere mistake.

" 'In the modern world the financial credit of a man, particularly of one engaged in commercial pursuits, is a much prized and valuable asset. Although laboriously built it is easily destroyed. The banks of the country, through which the great volume of our commercial business is transacted, have a deserved reputation for accuracy and care in the conduct of their affairs. Hence when a check of a depositor is refused at the counter of his bank, that portion of the commercial world, greater or less, that comes within the sphere of his transactions, promptly imputes the blame to him rather than to the bank. * * *' ... *Weiner v. North Penn Bank, Inc.* (1916), 65 Pa.Super. 290 ....

" ' * * * To return a check marked "Refused for want of funds" to the holder, especially through a clearing-house, certainly tends to bring the drawer of that check into disrepute as a person engaged in mercantile business; and it needs no argument to show that a single refusal of that kind might often, and frequently does, bring ruin upon a business man * * *' " ... *Schaffner v. Ehrman* (1891), 139 Ill. 109, 670, 28 N.E. 917, 919, 15 L.R.A. 134."

Given today's opinion by the Court, my preference is overwhelmingly with that which White & Summers have written, embodying the views of Justice Cardozo:

"That the draftsmen may have intended to perpetuate the *per se* liability rule in

'willful' cases is also supported by the Code history embodied in a pre-Code statute and decisions under it. That statute and those cases make just the distinction we suggest; namely, that a bank that dishonors a check through inadvertence or mistake is not liable for *per se* defamation of a merchant or trader, and is so liable only if its dishonor is willful or malicious. If the draftsmen wished to abolish the trader rule altogether, they should have chosen stronger language in the face of this pre-Code statutory and case law history. Certainly the reference to 'mistake,' in the second sentence of 4–402 invites a court to adopt the relevant pre-Code distinction.

"One who believes that the trader rule still applies at least when wrongful dishonor is willful must distinguish mistaken from willful dishonor. Under pre-Code law, while most jurisdictions applied the trader rule without distinguishing between mistake or willful action, the New York courts recognized the distinction. In *Wildenberger v. Ridgewood National Bank*, the bank initially dishonored checks of its customer when his wife filed an adverse claim to the account, and with notice of the first wrongful dishonor the bank dishonored the checks a second time. At trial the customer, a merchant, recovered nominal damages. On appeal, Mr. Justice Cardozo, writing for a unanimous court said:

" 'We think the plaintiff's damages were to be determined by the jury. The dishonor of the checks was admittedly a wrong.... The wrong, if willful, charged the bank with liability for the consequences. In many jurisdictions the liability is the same whether the wrong is willful or merely heedless.... In this state the liability is for nominal damages and no more, if the dishonor of the checks is the result of innocent mistake. That was the situation in *Clark Co. v. Mt. Moris Bank*, 85 App.Div. 362, 83 N.Y.Supp. 447, and 181 N.Y. 533, 73 N.E. 1133, where dishonor was due to the blunder of a bookkeeper, who misread the plaintiff's

balance. Sometimes we are told that, to permit the recovery of substantial damages, the wrong must be malicious. This does not mean, however, that it must be the product of hatred or malevolence. It is the exclusion of liability for the consequences of accident or mistake.... We find nothing of accident or mistake in the defendant's dishonor of these checks. It dishonored them with full knowledge of the state of the account, setting one risk against another, the risk of adverse claims against the risk of broken contracts. Here was no heedless act, but one deliberate and willful.'

"We would adopt Justice Cardozo's test and find the bank guilty of willful dishonor and thus subject to the trader rule any time it dishonored its customer's checks because it had previously reduced his account through its own improper setoff, improper garnishment or the like. Moreover we would find such reduction 'improper' even though the bank acted in a good faith but mistaken belief that the garnishment or setoff was valid. Although such dishonors might be the result of a 'mistake' in the sense that the bank official was mistaken about his legal rights, we would classify them as willful for they represent the bank's deliberate judgment to sacrifice the customer's interest to those of some other party. If courts apply the trader rule to cases in which the bank knowingly disobeys its customer's order to protect some other party, banks may become more appropriately loyal to their customers' interests." White & Summers, *supra* § 17–4 at 671–73 (Footnotes omitted.)

The pre-U.C.C. opinion of Justice Lockwood of the Arizona Supreme Court is other impressive authority which I find enlightening and persuasive, especially in view of a recent case from that state's court of appeals, *Continental Bank Corp. v. Fitting*, 114 Ariz. 98, 559 P.2d 218 (Ct.App.1977), where the provisions of § 4–402 were applicable. In the earlier case, *Valley National Bank v. Witter*, 58 Ariz. 491, 121 P.2d 414

(1942), the opinion dealt with the evolution and effect of the trader rule:

"In the ordinary case of debtor and creditor, the former is not liable to the latter in an action in tort for a failure or refusal to pay the debt, since the liability arises out of contract and is limited to the amount of the debt. However, while the relation between the bank and the depositor is that of debtor and creditor, in our modern world the effect upon the depositor of the refusal of the bank to pay upon his order goes far beyond the effect of such a failure to pay by an ordinary debtor.... the refusal of a bank to pay a check of its depositor is generally considered by those who know of the failure to be an imputation of wrongdoing against the depositor and an attack upon his character....

"In the present case the complaint ... is based ... upon the damage to the credit and reputation of plaintiff. The question then arises as to what damages are allowable in such a case and how they must be proved. The leading cases in England are *Marzetti v. Williams*, 109 Eng.Reprint 842, and *Rolin v. Steward*, 139 Eng.Reprint 245. In these cases, as in most of the earlier American cases, a distinction was made between cases where the depositor was a merchant or trader and where he was not. In the first case it was very generally held that the mere proof of the dishonoring of the check entitled the plaintiff to 'not nominal or excessive, but reasonable and temperate damages.' *Rolin v. Steward*, supra. In the second, although nominal damages should be awarded without further evidence, substantial damages could only be awarded on allegation and proof of special damages.

"... The situation, however, has greatly changed in recent years. The vast majority of all modern financial transactions, whether carried on by traders or non-traders, are based upon credit. A large percentage of our population conduct even their household accounts on a monthly credit basis, usually paying by checks on their own bank accounts, and the dishonoring of one of those checks would presumably affect their credit, even though it was not as great in dollars and cents, just as seriously in proportion to the extent of their transactions with those who knew of the dishonor, as would the dishonoring of the check of a great merchant. In both cases, under modern business conditions, we think the presumption from the mere fact of dishonor is that the credit of the depositor was injuriously affected. As was said in Morse on Banks and Banking, 6th Ed., page 1007, par. 458:

"'* * * It can hardly be possible that a customer's check can be wrongfully refused payment without some impeachment of his credit, which must in fact be an actual injury, though he cannot from the nature of the case furnish independent distinct proof thereof. It is as in cases of libel and slander, which description of suit, indeed, it closely resembles, inasmuch as it is a practical slur upon the plaintiff's credit and repute in the business world. Special damage may be shown, if the plaintiff be able; but, if he be not able, the jury may nevertheless give such temporary damages as they conceive to be a reasonable compensation for that indefinite mischief which such an act must be assumed to have inflicted, according to the ordinary course of human events. * * *'

"We hold, therefore, that in the present case, plaintiff was entitled to 'reasonable and temperate' rather than 'nominal' damages upon the proof of the wrongful dishonoring of his checks, without the necessity of showing affirmatively specific damages. In addition to these general damages, he, like any other depositor in similar circumstances, might recover, upon proper proof thereof, any peculiar and special damages which he may have suffered by reason of the conduct of the bank.

"... plaintiff was entitled to substantial damages. These damages, even though general in their nature, might vary considerably in accordance to the extent which they injured plaintiff's general credit. We think, therefore, that any instance in which plaintiff was denied credit or lost the opportunity to engage in a business transaction by reason of the dishonoring of the checks was admissible on the issue of general damages, even though the details of the transaction might not be admissible as tending to show special damages.... The same is true in regard to the loss of credit with certain mercantile institutions. As was said by the court, where general damages to financial reputation and credit are concerned, it is almost impossible to furnish specific evidence of their extent and this can only be based upon evidence of the general effect upon plaintiff's financial standing in the community." Id. 121 P.2d at 418–19.

Highly significant in the sequel, *Continental Bank Corp. v. Fitting, supra,* is its restrictive holding that *Valley National Bank v. Witter* is no longer applicable for wrongful dishonor occurring by reason of mistake. 559 P.2d at 220. In *Fitting* the plaintiff conceded that the dishonor "was the product of a mistake." *Fitting* cannot be said to stand for the proposition that it overruled *Valley National Bank v. Witter.* Equally significant in my opinion is that the Supreme Court of New Mexico accepted the validity of *Valley National Bank v. Witter* and the validity of the presumptions therein discussed in wrongful dishonors other than the product of mistake. In *Loucks v. Albuquerque National Bank,* 76 N.M. 735, 418 P.2d 191, a case under § 4–402 of the U.C.C., citing *Valley National Bank v. Witter,* the New Mexico Supreme Court said:

"What are reasonable and temperate damages varies according to the circumstances of each case and the general extent to which it may be presumed the credit of the depositor would be injured." Id. 418 P.2d at 199.

Of that the New Mexico court believed that Comment 3 had any application other than

to wrongful dishonors occasioned by mistake is hardly to be doubted where the opinion in that case points to and quotes from the Comment 3, immediately following which it states: "*If we can say* as a matter of law *that the dishonor here occurred through mistake,* then the damages would be limited to the 'actual damages proved.'" *Id.* at 198 (Emphasis added) The ultimate holding in *Loucks* is, then, that even for a wrongful dishonor by mistake, the plaintiffs there should have been allowed to go to the jury on the damage issues which they would have to prove—but if the wrongful dishonors were not found to be by mistake, then presumption of injury to the credit of the depositor comes into play, citing *Witter,* and the amount of damages "*is to be determined by the sound discretion and dispassionate judgment of the jury. Meinhart v. Farmers State Bank,* 124 Kan. 333, 259 P. 698, 701." 418 P.2d at 199.

In the pre-Code case of *American National Bank v. Morey,* 69 S.W. 759 (1902), the Kentucky Court of Appeals observed that the authorities "are equally uniform that when the bank fails to honor the check of its depositor, when he has funds with it sufficient to pay the check, a right of action accrues at once, and that *the recovery is not limited to nominal damages.* But if unable to show any special loss or injury, the better opinion seems to be that he would still be entitled to recover *moderate damages* ...'" *Id.* 759–60 (emphasis added). Following the enactment of the U.C.C. in that state, the Kentucky Court of Appeals in *Bank of Louisville v. Sims,* 435 S.W.2d 57 (1968), after setting forth § 4–402, emphasizing the sentence which takes up wrongful dishonors occurring through mistake, states its belief that the particular section codifies the common law measure of damages as it had existed in Kentucky, citing *American National Bank v. Morey, supra.* The appellate court decision went off on a holding that the dishonor there was by clerical mistake; plaintiff Sims not showing any special loss or injury to her credit or business reputation, and apparently making

no claim that a mistaken dishonor could give rise to a presumption either of some injury, or moderate damages.

In *First National Bank of Bellaire v. Hubbs*, 566 S.W.2d 375 (1978) the Texas Court of Civil Appeals in reversing because the action had been tried on an erroneous theory of liability, stated only that on retrial the "bank's liability for damages proximately caused by the wrongful dishonor of an item is governed" by § 4–402, under which provision the liability is limited if the dishonor occurred through the bank's mistake. Significantly that court observed that even for a mistaken dishonor, the recovery may include "consequential damages, as for loss of credit and mental anguish." That court appears to have accepted without question that the last two sentences of § 4–402 are elaboration upon the third sentence which singles out for attention those wrongful dishonors which have occurred through mistake.

In the same year in another case where the appellate court did not make any attempt to distinguish mistaken dishonors from wrongful dishonors not so occasioned, the plaintiff apparently had proceeded on a negligence theory (bank's failure to use due care in paying a stale check thereby causing the dishonor of another check). The court found that damages awarded for the dishonor were not sustained, due to the plaintiff's failure to submit proof that the bank's actions caused him any loss, and introduced no "testimony that plaintiff's credit or commercial reputation was affected in any way by the bank's actions." *Charles Ragusa & Son v. Community State Bank*, 360 So.2d 231, 234 (La.App. 1978). Having adopted a negligence theory, it appears that the plaintiff did not contend that the wrongful dishonor was other than mistaken, and did not urge that the burden of going forward shifted to the bank on proof of the dishonor. Nor does it appear that the bank defended on the basis that it had acted mistakenly.

In our case now at bench, however, the trial court in the first instance, and all members of this Court in the second, agree that the bank here was not entitled to the benefit of a limitation of the liability which it would have incurred by reason of a wrongful dishonor brought about by mistake.

C. *Evidence to Establish Injury or Harm to Plaintiff's Credit and Business Reputation.*

As stated earlier herein, the bank in its opening statement advised the court and jury that it would endeavor to establish that the plaintiff suffered no injury to its credit or business reputation. To prove this the bank stated that it would establish by the evidence that some three weeks and three days after the wrongful dishonors the plaintiff's line of credit with the Farmers and Merchants Bank, Spokane Valley, was increased substantially. Notwithstanding such, the plaintiff went about the business of establishing to the jury that it had suffered injury and that it was occasioned by the dishonoring of the checks.[4]

Prior to trial the plaintiff took the deposition of Mr. Thornycroft, the bank manager at the time of the wrongful dishonors. At the trial, and following opening statements, with Mr. Thornycroft on the stand the plaintiff first read the deposition into evidence. Pertinent portions thereof which were proof of injury or harm done to the plaintiff are as follows:

"Q And what type of business did you know at that time that the Yacht Club Sales and Service, Inc., engaged in?

"A Sales and service of boats and equipment.

"Q Generally describe the type of banking activity that occurred with this particular account during your handling or knowledge of it?

---

4. There is no need to engage in any discussion of the evidence insofar as it showed that the dishonors were wrongful dishonors not occasioned by mistake. The district court ruled that they were willful dishonors not caused by mistake, and this ruling of the district court is upheld by the Court's opinion. In mentioning some of the evidence, the element of willfulness or intentional dishonor with a self-evident revelation of no regard for the plaintiff may show through, but will not be elaborated upon.

**880**

"A Deposits and checks issued against the account.

"Q Did it have an average balance, or can you describe an account with that type of generality?

"A It appears to be a normal account.

"Q Does it contain a four figure average balance or a five figure average balance?

"A I would say probably a four figure.

"Q Was it a checking account only?

"A Yes.

"Q To your knowledge was this the Yacht Club Sales and Service principal checking account?

"A Judging by the activity, it probably was.

"Q Most of the business transactions were either deposits or disbursements through your account through Yacht Club Sales and Service?

"A I would presume so, yes.

"Q And did the Yacht Club Sales and Service, Inc., have a line of credit that we would call an open line of credit with your bank in May and June of 1975?

"A Not a line of credit as such, no.

"Q Have you advanced open lines of credit from time to time from the initiation of your account with that corporation?

"A Yes, they borrowed from time to time.

"Q What figures did they operate within?

"A I believe the highest probably was $10,000.

"Q Up to June of 1975, had the Yacht Club Sales and Service Corporation been a good account?

"A Yes.

"Q Isn't it a fact that you were aware through your relationship with the customer, that Farmers and Merchants Bank floored Mr. Harris's corporation, Marine Products, were not you, were you well aware of that fact?

"A I knew he had a line there, yes, but what it was, I haven't any idea.

"Q But you had a lot of transactions through you bank concerning the Farmers and Merchants Bank with this customer, did you not?

"A Explain it please.

"Q You were aware that the plaintiff corporation had dealings with the Farmers and Merchants Bank, you were personally aware of that?

"A I knew that he had some dealings, yes.

"Q You knew his, like his boat items, were floored through the Farmers and Merchants Bank, did you not?

"A Not off-hand, I don't think.

"Q Since the bank's mistake, what has occurred with regard to your and the Yacht Club Sales and Service business relationship?

"A Since this?

"Q Yes.

"A In what line, Bill?

"Q Just describe what has happened with the account, is it the same good account as it always was, have you handled the plaintiff corporation's banking needs as you did before?

"A We haven't granted additional credit.

"Q Why is that?

"A We felt that it would not be proper credit decision to be made under possible threat of suit.

"Q There is actual suit for what happened, so you stopped the credit because of your own mistake, is that what you are telling me. Are you telling—making a record under oath that your bank stopped further extension of any credit because of your own bank mistake in the way one of the customer's accounts was handled?

"A No.

"Q Why did you stop the credit exactly, if you know?

"A Proper credit decision could not be made.

"Q Because of a lawsuit?

"A Because of possibility of a lawsuit.

"Q But any citizen in our society under law is entitled to a day in court to determine their legal rights, are they not, do you agree with our system?

"A Yes.

"MR. NAYES: Object to that.

"MR. NIXON: He has answered it.

"Q It is not a political philosophy, we have legal banking regulations we are required to comply with, do we not; once you accept an account, you have benefits and responsibilities, do you not?

"A Yes.

"Q And the client has benefits and responsibilities, right?

"A Yes.

"Q The customer, what did Mr. Harris's corporation do wrong, ever, with your bank; they didn't do anything wrong, did they, Cy?

"A Not to my knowledge.

"Q And they enjoyed a good credit relationship with the bank up until the time your bank had done the wrong that you yourself admitted to, did they not?

"A Yes.

"Q Now, so I understand your testimony, Mr. Thornycroft, because they have attempted to have that wrong redressed by ultimately filing the action, they didn't get any credit with your bank because of that action?

"A Yes.

"Q Mr. Thornycroft, following the June 27th activity, isn't it a fact that the Yacht Club Sales and Service Corporation applied for another loan with your bank on open line notes?

"A They applied for a loan, yes.

"Q It was dissimilar to any previous act by that customer with your bank?

"A Yes, it was.

"Q Is it a fact that you advised Mr. Harris when you refused it that he could have the loan if he would drop the prospective suit?

"A No, I told him that would be one requirement.

"Q That would be one requirement, you said he could have a $10,000 loan if he would drop the suit?

"A Not in words that way, no.

"Q What are the words you recall? When did it happen, who was there, and what was said?

"MR. BRIGGS: I would object to this line of questioning. How is it material to plaintiff's complaint against our bank for holding funds?

"MR. NIXON: They made a mistake and then because of their own mistake, he didn't have the same good credit relationship with the very bank that made the mistake that he had previous.

"MR. BRIGGS: Go ahead.

"Q The plaintiff corporation never had trouble getting loans up to $10,000 or up to whatever amount the loan ledger reflects, did they?

"A No.

"Q They were current as far as you know on the 18th, no problems credit-wise?

"A No.

"Q And as a business customer, once you accept demand deposits, you, as a bank, are also responsible for their proper credit needs, are you not? Once you take an account on, you have responsibility to service that account and handle their business requirements so far as within reason, do you not?

"A It doesn't necessarily involve granting of credit.

"Q Ordinarily it does, doesn't it? Let's be realistic and honest about this banking relationship. If you accept a person as a customer and accept his demand account

and handle his business as his banker, isn't it a fact that it is normal and customary to also handle their credit needs?

"A Yes.

"Q In your experience as a banker that has always existed, is that not correct, you don't just get the sweet demand deposits and tell them to go somewhere else with their loans, do you?

"A No.

"Q And a demand account is one of the best money earning features of banking, is it not, you don't pay any interest on those funds, do you?

"A No.

"Q It is one of the finest things you can have is a lot of demand accounts as a banker, isn't it?

"A Yes.

"Q And is there anything better—you can't go over ten percent on a loan, what is better in the banking business than a big demand account?

"A Off-hand, nothing.

"Q So you agree then that with the benefits of that type of account comes the commitment of handling proper loans, do you agree with this?

"A Normally, yes.

"Q Historically, normal banking procedure?

"A Yes.

"Q And Mr. Harris had enjoyed that relationship, he had a good relationship as far as handling of his account and obtained open lines as he needed them?

"A Yes.

"Q No previous problem?

"A No.

"Q And then when the mistake occurred, because of your bank agent's activities, which includes yourself, he wasn't able to get a loan, was he, following the June 18th to 26th time?

"A The request was postponed pending—to see what was going to happen on the action.

"Q And he had never done anything wrong, the only wrong that occurred was on the part of the bank, the defendant bank, is that right?

"A Yes.

"Q Is good credit important to a business such as the plaintiff's in this action?

"A Yes.

"Q What is your recognition to what this type of activity as evidenced in your Exhibits 1 and 2, what is the net effect on a person when they have that many checks not collected and they didn't have use of some $51,000 for eight or nine days?

"MR. BRIGGS: Object, he doesn't have any idea of what the effect would be on the Yacht Club.

"Q Would this be adverse or beneficial to a business customer?

"A Probably adverse."

Plaintiff then introduced the testimony of Mr. Rex Phillips; he was at the time of the wrongful dishonors the executive vice-president of the Farmers and Merchants Bank, senior officer of the bank and responsible to its board of directors. His testimony as given to the jury on the issue of harm or injury to the plaintiff's credit or business reputation was as follows:

"Q Did the Yacht Club Sales and Service Corporation bank with your organization?

"A Yes, they did.

"Q Is it a fact that they became a corporation, when approximately. If the records of the corporation reveal it was in November of '74, would you argue with that?

"A If that is the date that would reflect on the records, I recall Mr. Harris advising the bank that he was converting from a sole proprietorship to a corporation. We were aware of that fact.

"Q So throughout the entire year of 1975, it was the Yacht Club Sales and Service, Inc.?

"A If that is the date of incorporation, that would be correct.

"Q My question though is for the entire year of 1975 to date they have been incorporated?

"A Yes.

"Q As of January 1st?

"A Yes.

"Q Did your bank do business with the Yacht Club Sales and Services, Inc., in the year 1975?

"A Yes, we did.

"Q What type of accounts or activity did you have with his corporation?

"A Mr. Harris had a checking account in the name of his business firm and then we loaned money to Mr. Harris's company to finance boat inventory.

"Q Is that called a flooring account?

"A That would be called flooring, and then we also from time to time financed contracts for customers that would purchase boats from Mr. Harris and his company.

"Q Did you buy these contracts?

"A Yes.

"Q Recourse or non-recourse?

"A I cannot recall.

"Q I will withdraw that question. Who was the principal of the Yacht Club Sales and Service, Inc., who was the principal individual involved with you and your bank?

"A Mr. Harris.

"Q To your knowledge was it a closely held corporation or widely held in stock?

"A As far as we know, it was closely held.

"Q Mr. Harris and his wife only, if you know?

"A As far as I know.

"Q In June of 1975, did the Yacht Club Sales and Service, Inc., have, had they continued into that month as a customer of your bank?

"A I'm sorry I didn't hear part of the question.

"Q In June of 1975, had Mr. Harris's corporation Yacht Club Sales and Service, Inc., continued as a customer of your bank?

"A Yes, they had.

"Q And beyond that period as well?

"A Yes.

"Q Into July and August, is that right?

"A Right.

"Q Would you describe chronologically what you know as to the facts that occurred, facts within your knowledge, Mr. Phillips, as to what occurred from June 18th and thereafter, just describe chronologically what happened, what occurred?

"A Without having all of the dates in order and not referring to any bank records, we continued to finance Mr. Harris's company for flooring of new boats, motors, and trailer, and when the occasion would arise, we would finance a contract from a customer that would have purchased a boat from Mr. Harris's company. We thought we had all of Mr. Harris's business, and we had operated under that concept for quite some time, seen from time to time deposits coming in and checks being written on the account. Then at some date in June, we received some small checks back from a bank in Idaho, and if I recall correctly, one was to a young man by the name of John Layman and his friend that had been working for Mr. Harris during the summer. They had been returned and I was given those checks by my operations people and the manager of the Valley Office, Mr. Rich Emery, and this caused some concern. If we had a credit line outstanding to purchase and finance boats in the amount of money that we had out and two small checks were being returned, that threw us into a great amount of concern, and we thought what is going on. So we from that point started checking the problem out. We called the bank in Idaho and were told the checks could not be paid then.

"Q Do your recall who you spoke to during that phone call?

"A At that point I did not make a phone call, I had, it would have been possibly Ray Walker which is the operations officer at

the Valley Office of the Farmers and Merchants Bank.

"Q Was it something within your own personal knowledge?

"A It was someone within my own personal knowledge and it could have been Rich Emery or it could have been Dan Carlson, our assistant auditor, that called. Then during the course of checking this problem out, we checked the flooring note and found that—

.     .     .     .     .

"Q Did you contact Mr. Harris after you found one of his employees checks to have been returned?    .

"A The first thing that would have happened in my position as executive vice-president, it was my duty to know what was happening within the bank, but I delegated responsibility to other people and that would have been Rich Emery of the Valley Office. He probably was the first one to have contacted Mr. Harris.

"Q What did you find out of your own knowledge, Mr. Phillips, so far as the situation at The First National Bank of North Idaho?

"A It would have been reported back to me that the checks had been dishonored and that they could not be paid at that time at which time I then called Mr. Harris to find out what the difficulty was.

"Q What was your reaction with respect to Mr. Harris?    .

"MR. NAYES: I am sorry, your honor. I object to that question. I think this is a corporation. I would think that the proper inquiry would be what was Mr. Phillips's concern with his corporation at the time.

"Q As a corporation officer and chief executive officer of your Farmers and Merchants Bank Corporation, what was your reaction with respect to your customer Yacht Club Sales and Service, Inc.?

"A We had a considerable amount of money loaned to Mr. Harris at that time, and I called Chuck up, and I do not recall the exact words of the conversation, but it went something like this, Chuck, we have

received certain checks back today, what is going on. Mr. Harris said, Rex, there is something wrong. I know that I have plenty of money in the bank to cover those checks.

"Q Was he aware, was Mr. Harris aware at that time that these checks had not cleared?

"A I do not know if he was aware that the checks had been dishonored until my phone call came. The conversation on the phone indicated to me that he knew nothing that had happened.

"Q And on the 25th of June, 1975, did you send a letter to Yacht Club Sales and Service, Inc.?

"A I sent a letter, I do not recall the date, but the letter set forth the items that we had discussed on the phone.

"Q Handing you what has been previously marked for identification as Plaintiff's Exhibit 5. Could you identify that, sir?

"A This is the letter dated June 25th, '75, to Mr. Charles Harris, Yacht Club Sales and Service, Coeur d'Alene, and bears my signature signifying that this is the letter I sent to Mr. Harris.

"Q Did you place this in the mail to him?

"A Yes, we did.

"MR. NIXON: I would offer this in evidence.

"MR. NAYES: I have no objection.

"THE COURT: It will be admitted.

(Plaintiff's Exhibit 5 admitted
into evidence.)

"Q Could you read to me what you wrote on that day?

"A The letter is directed to, 'Mr. Charles Harris of Yacht Club Sales and Service, Coeur d'Alene, Idaho. Dear Chuck, this letter will follow up our telephone conversation that the two of us had this date concerning two checks that were returned to us with a notation, refer to maker. Also, our conversation also covered check No. 397 for $510 payable to Farmers and Merchants

Bank, and check No. 420 for 199.76, check No. 396 for $724, check No. 41 for 199.76. All of these checks were drawn on First National Bank of North Idaho. After receiving these checks, I took the liberty to call the bank to make a determination that these other checks would be good if they were presented. I was told by the bank that they would not be in a position to pay the checks at that time. I am returning these checks to you and I am requesting a certified check to be forwarded to us immediately to replace these checks. I also checked the activity on the account here and find that we have had no activity on the account at the Farmers and Merchants Bank with Yacht Club since the middle of May, 1975. Additionally your flooring note, No. 302, with a present balance of $6670 will mature on June 26th, 1975. Note No. 468 with a present balance of $12,307 will mature on June 27th, '75. At this time, I would state that these two notes would not be renewed and we will be looking forward to payment in full on these two notes.

Sincerely, R. M. Phillips, Executive Vice-President.'

"Q What effect did the return of the two items you mentioned at the outset of your letter have so far as renewal of credit or extension of credit on flooring lines?

"A At that point, as I mentioned at the bottom of the letter, we would not renew Mr. Harris's two notes that would be maturing, and we had further stated that we would want all of the loans to be paid as they became due.

"Q So my question is, what effect did the return of these employee payments checks have?

"A It meant that we were going to eliminate the credit line of Yacht Club Sales and Service, Inc.

"Q Any other reason that brought that about?

"A None.

.    .    .    .    .

"Q Were you advised by any agent of the defendant bank what would happen if you did present them?

"A We did in fact send Dan Carlson to the North Idaho bank with some checks for payment and presentation and they were rejected.

"Q And which ones are they, if you know?

"A Those were the checks that had been given to Farmers and Merchants Bank for deposit and those are the checks that I would not deposit into Mr. Harris's check without first taking them to the bank and receiving a cashiers check for the checks.

.    .    .    .    .

"Q To your knowledge then, Mr. Phillips, what did your bank then do with respect to the Yacht Club Sales and Service, Inc.?

"A At that point in time, there was more conversation that transpired, but the net effect was that Rich Emery, the manager of the Valley Office, and myself went to Yacht Club Sales and Service, Inc., and made a floor check, a flooring check, meaning that because of the problem that we were encountering, we went over to insure that all the inventory of boats that Farmers and Merchants Bank had as collateral were in fact on the premises. Then we took the checks that I had previously mentioned to again attempt to process them through the bank.

"Q Were they processed then?

"A They were not.

"Q Did this have any effect upon your reaction as to Mr. Harris's corporation?

"A It did have, and it resulted in a meeting with the chairman of the board of the bank, August V. Klaue, and John G. Layman, president of the bank, and myself along with Rich Emery having a meeting and—I should back up, prior to that, just prior to that, the day before, I had called Auggie Klaue of the bank and told him that I was withdrawing the credit line of the Yacht Club Sales and Service, Inc., and then we had a meeting the following morning.

"Q Is a credit line important to a business such as Mr. Harris's, the Yacht Club Sales and Service, Inc.?

"A The credit line is important to a business if they do not have money enough to finance it themselves, then the bank steps in and takes the position of the customer's own cash.

"To your own knowledge as a banker and knowing Mr. Harris's corporation, the Yacht Club Sales and Service, was his line of credit important to his operation?

"A The way we analyzed the account and financial statements of Mr. Harris, he could not have operated his business at the size that it had grown without the assistance of a bank or some other individual interjecting money into the business giving him funds to purchase boats.

"Q So was it important or unimportant to him, your banks credit to him?

"A It would have been important.

.    .    .    .    .

"A The events that led up to us making a decision was the fact that the checks were rejected by the bank, returned to Farmers and Merchants Bank. We sent on five different occasions on checks, Dan Carlson, our assistant auditor, to the bank in an attempt to clear the checks and through my trip along with Mr. Carlson's trip to the bank in Coeur d'Alene found that the checks could not be cleared and that the funds were being held, and at that time, we did not know why they were being held. The bank did not tell us, you know, which was their right to do so I presume. We then—

.    .    .    .    .

"Q Was the credit problem immediately corrected then or were there further meetings throughout the time following June 27th?

"A Well, there were further meetings. We had called up the suppliers of the boats over in Tacoma, I believe it was, Bryant Corporation was one of the companies, and they always called us to see if money was available and we had stopped shipment of a truckload of boats because we told them we would not be in a position to pay for the boats.

"Q How would that affect Mr. Harris's corporation's business operation?

"A It would cut down the inventory of boats for sale. He would only have available for sale those boats that he had in inventory. No new ones would be added until he went someplace else and got money.

"Q How did he get boats that were floored, were they presented to your bank for payment or did he pay for them?

"A Different companies operated differently, but as I recall, after we had the problem we had the invoices shipped directly to the Farmers and Merchants Bank, and we would pay the boat manufacturer direct. There was times in our dealings with Mr. Harris, and again not having handled all of the transactions, at some point Harris was paying his boats directly and sometimes we were paying, and I do not know which ones were paid direct and which ones were not.

"Q Did you personally call any other boat suppliers to the Yacht Club Sales and Service, Inc.?

"A I called the credit manager of Reinell Boat Company and Bryant Boat Company.

.    .    .    .    .

"Q Well, his corporation had a business relationship with your bank, did it not?

"A Yes, and I can only identify to that relationship.

"Q Describe whether it benefited or remained more or less the same or adversely affected that relationship, Mr. Phillips.

"A As it affected my relationship as executive vice-president, making recommendations to the Board of Directors, I recommended that the credit line be discontinued and no more credit advanced.

"Q Was that a beneficial result or an adverse result?

"A Well, in my opinion, it would adverse as it related to our bank because there was no more money available to buy boats from our bank.

"Q Did it affect the method by which you handled future flooring?

"A Yes, it did.

"Q How did that affect Yacht Club Sales and Service, Inc.?

"A As a result of what happened, we had a meeting with the Board of Directors and the Board gave Mr. Emery directions as to how we should proceed in the future, and I believe that was outlined in a letter from Mr. Emery to Mr. Harris.

"Q Are you familiar with the terms of that, of your own knowledge?

"A I can tell you some of it because I would have voted on the loan approval. One, that all banking relationship be transacted with Farmers and Merchants Bank and that he discontinue what, in banker's terminology, is dual banking, that would be banking at more than one bank. We wanted him to bank with us so we would know what was going on at all times. Secondly, that any money received on boats that were floored with Farmers and Merchants Bank would be sent directly to the bank in the exact amount of money that we had out on the loan. Third, that the boat dealers, speaking of Reinell and Bryant, send the invoices straight to Farmers and Merchants Bank for payment, and I believe there was some other terms, but I can't recall what they were without seeing the loan approval.

.    .    .    .    .

"Q What was the duration of the period during which the flooring credit was totally or however interrupted?

"A I am not sure but I think there was probably a period of about 30 days of interruption of the normal credit line that had been previously established.

"Q In your experience as a banker, how would you describe the period of from toward the end of June, toward in the boat business?

"A Well, it was a critical time from the boat companies standpoint. Naturally, in July Mr. Harris should have, and I do not know if he had sold the major portion of the boats that he would have sold for that year, and he was going into the time of reordering for the following year. The boat business is rather unique from that standpoint, you must submit your boat order months and months ahead of time because each boat is basically custom built for that particular dealer, and if he doesn't get his order in, he has no boats for the following spring. We found that most of the boats sell from mid-February to mid-June to the end of June, then they pretty well curtail sales until the new boats come out.

"Q How would you describe that need for credit during that period, from the end of June to the end of July, vital and important, so-so, how would you describe it?

"A From June until the end of that year, it's extremely critical because if he doesn't have money available, he cannot order boats for the next year's sales."

On cross-examination by bank counsel:

"Q I believe you have testified, Mr. Phillips, that you became concerned about the line and because there were a couple of small checks returned to Farmers and Merchants Bank, is this correct?

"A That was the situation that caused us to start checking it again, those two small checks I previously testified to, Erickson and Layman.

"Q Okay, at the time you received those two checks, do you recollect what the outstanding line was to Yacht Club Sales and Service, Inc., at that time?

"A No, I do not because Mr. Emery handled the account, and it would have been somewhere in the neighborhood of 75,000 or maybe Harris had paid below that or the line had been increased, but it would have been in the neighborhood of 75,000, I believe.

"Q Subsequent to this transaction we are speaking of here between June 19th, 1975, to approximately June 26th, 27th, of 1975, subsequent to that time did Farmers and Merchants once again increase the line, to your recollection, increase the line to Yacht Club Sales and Service, Incorporated?

"A After June 27th?

"Q Yes.

"A I believe that line went to $150,000.

"Q  Approximately how long after these checks that you spoke of were received by the bank did the line increase from $75,000 to $150,000?

"A  I believe that was sometime in July, probably around the 21st of July, or it was sometime in July that we increased the line again.

"Q  So then within three weeks of the time that you received these two small checks back of which you spoke, the one to John Layman and the one to Ramon Erickson, within three weeks subsequent to that Farmers and Merchants Bank actually what, doubled Yacht Club Sales and Service, Incorporated's, credit line, is that correct?

"MR. NIXON: I'm going to object to the form of the question, it would be three weeks and three days.

"THE COURT:  Well, I think the question may stand.

"Q  Is it your testimony that Farmers and Merchants Bank increased the credit line of Yacht Club Sales and Service, Incorporated, from $75,000 at the time you received, or Farmers and Merchants, I am sorry, received the two small checks back, that within three weeks and three days later that that line was upped to $150,000, is this your testimony?

"A  My testimony would be two phases. One, you mentioned two small checks, there were more than just the two small checks that I have previously testified to that caused the problem.  The two small checks were the ones that began our question. Secondly, to answer to the second part of that question is that sometime between the time that the first problem arose in June to the time that the problem was ultimately resolved, we did increase the line back up to whatever figure that was, and I do believe it was $150,000 in July."

Mr. Harris, plaintiff's president, testified that he owned all of its stock, and operated its marine and boat business on Blackwell Island at Coeur d'Alene.  Pertinent to the harm done by the wrongful dishonor he testified:

"Q  Describe the sequence of events without reporting conversations.  The third party is not here available for cross examination, just what is within your knowledge, Mr. Harris.

"A  I talked on several occasions to suppliers that I purchased equipment that I sell.

"Q  To your knowledge, had they been notified by the Farmers and Merchants Bank?

"A  They had.

"Q  What effect did this have on you?

"A  They were instructed by the Farmers and Merchants Bank according to their conversations that the bank would not floor merchandise for me any longer and wanted to know how I was going to pay for anything that I bought.

"Q  How did that affect the operation of your business then?

"A  I couldn't buy anything.

"Q  Describe the time of year from following July 18th on, what type of period that is within your business operation?

"A  July 18th?

"Q  June 18th, I'm sorry.

"A  Personally, or the business?

"Q  As Yacht Club Sales and Service, Inc.

"A  It was a time, lack of credit, lack of merchandise, we had a rather poor year.

"Q  When in your business, what do you normally do during the month of mid-June through July?

"A  That's the meaty part of our season. This is when we either make money or don't make money.

"Q  Describe for the jury if you would what percentage of your time was available from June 25th on as a result of what defendant bank did.

"A  Available where?

"Q  To the operation of your business, Mr. Harris, what happened?

"A  The operation of the business, as I do much of the selling, it would be part of the operation, is that correct?

"Q Were you able to sell?

"A I could only dedicate maybe half of my time to the business.

"Q Why is that?

"A Trying to patch up the credit problems that I had, to get merchandise, trying to explain to my creditors what happened.

"Q How much time was taken from your normal business operation?

"A In the preceding two or three months after the June 27th reopening of my account, I imagine I spent half of my time trying to get that straightened out.

"Q You mean from July, August, and September?

"A Yes.

"Q Of 1975?

"A Yes.

"Q During that period of time, were you able to devote full attention to what would be normal duties of your business?

"A No.

"Q Why was that?

"A I had to devote too much time to trying to correct the problem that I think was created by the bank.

"Q Well, were you able to get a loan at the bank for an open line of credit from the defendant bank?

"A I applied, I had a line, more or less there before, I borrowed, counting a contract account, I borrowed almost $20,000 from time to time and paid it off.

"Q Now Mr. Thornycroft in his previous testimony stated that during that year you had borrowings as high as $13,000 and by June you had paid them down in full, is that accurate?

"A That's accurate, that would be unsecured loans.

"Q Okay, were you able to get any unsecured borrowings or loans from the First National Bank of North Idaho, Mr. Thornycroft's bank, after they made their mistake?

"A I applied for a loan.

"Q Were you able to get a loan?

"A The loans was approved, the conditions I couldn't meet.

"Q And what were they?

"A That I would have to sign a note dropping this lawsuit.

"Q Was that a condition to that loan?

"A Yes, it was.

"Q So you were not able to get a loan or did you take the loan?

"A No, I did not.

"Q Because they made a mistake, you were not able to get credit unless you dropped any claim, is that what you are saying?

"A That's correct.

"Q How did that affect your relationship with the Farmers and Merchants Bank in Spokane?

"A I was subjected to increased flooring inspections, it was not a friendly situation.

"Q Did they say anything about who you could bank with in Coeur d'Alene?

"A At that time, they asked me not to bank with anybody but them.

"Q How far distant is that bank office from your business operation?

"A Approximately 30 miles.

"Q Describe how convenient that would be for your banking.

"A It would be extremely difficult to go there everyday.

  ·  ·  ·  ·  ·

"Q Now how would you describe your credit relationship with your flooring bank at the time, the fact we are concerned with here, beginning June 18th, 1975?

"A Fragile.

"Q And how were they after the time sequence from June 18th through June 25th?

"A Non-existent.

"Q Did you sustain any damages?

"A Certainly.

"Q If so, what?

"A  It effectively removed me from the marine business for the year 1975 after June.

"Q  Why was that?

"A  I couldn't purchase boats, there was no time to take care of my business. With that kind of a relationship with a bank, you never know exactly what you can do.

"Q  Did you have the same good banking relationship with the defendant bank as you had before they made their mistake?

"A  No."

IV. *Summary.*

As was noted in the bank's brief furnished to the trial court, the challenged instructions left the burden, if such it could be properly called, on the bank to come forward with evidence showing, if it could, that the wrongful dishonors did not actually cause any injury to the plaintiff's business and credit standing. On that set of circumstances, it is obvious that the particular choice of words should not have been the cause of any confusion on the part of anyone. Something has to be conceded for the intelligence of jurors, who here had the benefit of able counsel's summarizing of the evidence, and the issues to be decided. One commentator has suggested:

"There is actually no need for a presumption of injury to credit because such an injury is not difficult to establish. In *Loucks v. Albuquerque National Bank* [76 N.M. 735, 418 P.2d 191 (N.M.1966)] the depositor presented evidence that, after the dishonors, some individuals and firms who had previously taken his checks now refused to do so and that other businesses had denied him credit. Similarly, in *Meinhart v. Farmers' State Bank* [124 Kan. 333, 259 P. 698 (Kan.1927)] the depositor introduced evidence that he had been denied credit because of the dishonors. In *Northshore Bank v. Palmer* [525 S.W.2d 718 (Tex.Ct.App.1975)] the customer presented evidence of being denied credit for the first time . . . . However, once injury to credit has been established, it may be quite difficult to prove the exact dollar amount of damages resulting from the injury."

Holland, An Analysis of the Legal Problems Resulting from Wrongful Dishonors, 42 Mo. L.Rev. 507, 525 (1977).

Issues of fact were presented to the jury with instructions which were entirely consistent with the evidence which had been submitted. Out of the mouth of an officer of the defendant bank the jury heard testimony from which it was at liberty to observe, as the trial court, too, so observed and so directed the jury, that the action of the bank was not an inadvertent or innocent "mistake." Rather, it obviously found that the bank had been presented an execution against some other third person whose name was similar, but by no means identical, to that of the plaintiff. In his omnipotence, that officer of the defendant decided that the execution *might possibly* have been meant to apply to the plaintiff here. Although plaintiff was a long time customer of the defendant banking institution, no inquiry was made to establish the identity, if any, between the third person subject to the execution and the plaintiff. No inquiry was made (for example, of the office of Secretary of State) to ascertain any legal corporate identities. An officer of the defendant, without foundation therefor and in wanton disregard of plaintiff's interest, as the jury so found, took it upon himself to apply a writ of execution against the account of a customer not named in the writ, and did not even have the courtesy to inform that customer that such drastic action had taken place. As the district judge so aptly phrased it in his written opinion denying the bank's motion for a new trial:

"This Court further believes that when one considers the libelous effect of a wrongfully dishonored check, the unknown and unascertainable extent to which conversation has spread throughout the community about dishonor of a business man's check, and the fact that the bank has the first opportunity to prevent such, then the instruction states an appropriate rule of law founded upon sound public policy. Dishonored checks, in the opinion of this Court, generally

evoke amongst the public suspicions that the maker of the check is bankrupt or otherwise in financial distress, or may have committed a criminal act in issuing a check without sufficient funds. Any of these suspicions cannot help but be damaging to the business reputation of any business operation."

The verdict of the jury and judgment rendered thereon are well sustained by the evidence, and the Court should not interfere. To do so is an unlawful usurpation of the jury function, and can only bring the Court into disrepute. The Court further diminishes its stature in needlessly reaching out to strike down that which it uttered just forty-some months ago—doing so on the unsupported premise that the trial court erred in instructing the jury on the trader rule. The trial court simply did not do so.

At the expense of lengthening the opinion it has been necessary to set forth the evidence submitted to the jury on the issue of injury to plaintiff's credit and business reputation, and the scant evidence of the bank's. The interested reader cannot but conclude that the evidence overwhelmingly established that there was indeed injury done. The bank's evidence to the contrary and its argument in that regard border on the ridiculous. So viewed by a Court which unhesitatingly refuses to reverse even criminal convictions for error where the evidence is such that a different result could not reasonably be expected on a second trial, it is obvious that the burden of proving injury (which burden comes into play only when the evidence is in equipoise) was no factor in the jury's determination, and the Court today can scarce justify applying the principles enunciated in *Archer v. Shields Lumber Co., supra.*

There was no error in this trial, but even were the Court's view of Instruction No. 23

correct, any error would properly be deemed harmless.

## ADDENDUM, ON REHEARING

BISTLINE, Justice, continuing to dissent.

I. As the parties themselves and subscribers to the Idaho Capital Reports will observe, the Court has withdrawn its earlier opinion and issued another which appears to have little change, other than to now agree with Justice Shepard and myself that there was no prejudicial error in the giving of instruction no. 14.

Other than that nothing was gained by the granting of the rehearing, and the loss was another appeal being shoved back on our assembly line. I had hoped that the Court's new opinion would with logic and reason dispel that which I wrote earlier pointing out that the bank was well aware (better than this Court apparently) of the distinction between that burden of proof which is burden of persuasion and that burden of proof which is actually the burden of going forward. I had hoped that the Court would explain how the giving of instruction no. 23 was prejudicial in any respect, where it is impossible to say that a separate instruction fixing the burden of persuasion was even necessary in this case—where there is neither contention nor record to support a contention that the evidence on damages was in equipoise (which after all is the only time when the burden of persuasion comes into play), and the trial court's other instructions clearly told the jury the elements which had to be established by a preponderance of all the evidence[5] in order for plaintiff to recover. As stated in 31A C.J.S. Evidence § 104a p. 176:

"*Proof by either party.* The burden of proof is satisfied by actual proof of the facts of which proof is necessary, regard-

---

5. The trial judge in giving the jury the court's instruction no. 8 gave exactly Idaho Pattern Jury Instruction No. 105:

"INSTRUCTION NO. 8
"Any party who asserts that certain facts existed or exist has the burden of proving those facts.

"When I say that a party has the burden of proof on any proposition, or use the expression, 'if you find,' or 'if you decide,' I mean you must be persuaded, *considering all the evidence in the case*, that the proposition on which he has the burden of proof is more probably true than not true." (Emphasis added.)

less of which party introduces the evidence."

II. The inconsistency with which the Court disposes of punitive damages is worthy of one further comment. In *Jolley v. Puregro*, 94 Idaho 702, 496 P.2d 939 (1972), this Court, differently constituted one may be certain, let stand a nominal judgment of $150 upon which the trial judge had fixed $5,000 of punitive damages—which was also let stand. In *Yacht Club* the bank concedes that the plaintiff is at least entitled to nominal damages, and asked the trial court to so instruct the jury, wanting it limited however to $1.00. It will take a better, or at least more devious, mind than mine to understand on what basis the parties should be required to retry the amount of punitive damages recoverable—concerning which it cannot be honestly said that instructions nos. 22 and 23 would play any part. The only reasoning supplied by the Court's opinion is shot out of the sky by the Court's own *Jolley v. Puregro*. If consistency be the vice of little men, as has been remarked, the Court achieves much virtue today.